John Buck JACOBS, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

No. 9765.

United States Court of Appeals Fourth Circuit.

Argued March 1, 1965.

Decided Aug. 26, 1965.

Oliver W. Alphin, Durham, N. C. (Court-assigned counsel), for appellant.

William H. Murdock, U. S. Atty. (H. Marshall Simpson, Asst. U. S. Atty., on brief), for appellee.

Before SOBELOFF and BOREMAN, Circuit Judges, and BUTZNER, District Judge.

SOBELOFF, Circuit Judge:

Under the advice of his lawyer, supported by the strong urging of an elder brother, John Buck Jacobs, Jr., after some initial hesitation, pleaded guilty to one of four counts of an indictment for violating the Internal Revenue laws relating to distilled spirits. He was sentenced to serve a term of forty months. Some weeks after his arrival at the Atlanta Penitentiary, he filed a petition under Title 28, section 2255. After alluding to the requirement that a guilty

plea must be knowingly and intelligently entered, the petitioner recited that he did not recall having entered the guilty plea or any of his conversations with the lawyer, and that from time to time he had suffered similar lapses. These allegations might be somewhat wanting under strict rules of pleading but the judge, evidently making allowance for the fact that it was a *pro se* petition, perceived what the petitioner was driving at. Since the petitioner was an indigent, counsel was assigned. The issue being the petitioner's mental condition when he pleaded guilty, counsel promptly moved the court to designate an independent psychiatrist to make a mental examination at government expense. The judge declined to make the requested designation at that time, but stated that he would hold a hearing on the petition for relief and if the need for a psychiatric examination should then appear he would order it.

At the hearing Jacobs was not put on the stand to support the petition, but relatives and neighbors, all laymen, offered their observations of his mental condition and background. His mother told of episodes when the defendant would seem unaware of his surroundings and would suffer loss of memory. She also recounted that when he was fourteen years old he was sent to Duke University Hospital for treatment of that condition. The hospital report, which is in the record, indicated that Jacobs' I.Q. was only 57, placing him in the Low Moron category. Others testified that at times Jacobs had "spells" during which there was "something wrong" with him; also, that prior to and immediately after the trial he seemed "upset and confused." One witness testified that on occasion during the petitioner's childhood he seemed "different" from other children, and that once he attempted suicide.

The Government called Jacobs' trial counsel who testified that he noticed no mental abnormality in his client. The United States also produced Dr. Lawrence Bryan, a clinical psychologist, employed at the Atlanta Penitentiary, under whose supervision the Minnesota Multiphasic Personality Inventory was administered. He stated that the examination is not normally given to entering inmates and suggested that it may have been administered to Jacobs because of his history of mental problems and poor memory and for the further purpose of determining whether or not he was feigning illness. Dr. Bryan, the government psychologist, gave it as his opinion both that Jacobs was attempting to give an unjustified impression of mental illness and that he considered Jacobs of "inferior intelligence" but not "mentally deficient." The witness had not personally conducted the test, and cross-examination may have developed some doubt as to whether the testing had been performed by a competent person.

The District Court found this evidence insufficient to raise a substantial issue as to the petitioner's ability to understand the nature of the original proceedings against him and to assist counsel in his defense. Without ever acting on the motion for the appointment of a psychiatrist, it denied the section 2255 motion.

We express no final opinion as to the District Court's findings in respect to Jacobs' mental condition when his guilty plea was entered. We are of the view, however, that the District Court should have granted the request for an independent psychiatric examination.

While Jacobs' motion alone may not have furnished a sufficient initial basis for ordering a psychiatric examination, the testimony at the hearing showed that the claim of mental incapacity was substantial and not frivolous. Dr. Bryan recognized that Jacobs was "somewhat inferior" in intelligence and "quite possibly has some handicap of emotional instability," but the two psychiatrists who collaborated with Dr. Bryan in the examination, but were not called as witnesss, diagnosed Jacobs' condition as one of "Mental Deficiency; Borderline Intelligence."

At least enough is shown here to warrant further inquiry. Although the need

for a psychiatrist's services was no less than the need for the assistance of counsel, appellant was limited to the testimony of untrained relatives and friends. The testimony of the nonexpert witnesses could have served as the foundation for further investigation by a medical expert, but the court-appointed attorney's efforts were restricted by the lack of such light and guidance as only a psychiatrist might have furnished. No opportunity was afforded for medical appraisal of the lay testimony and a more sophisticated exploration of the problem.

■■ Unquestionably in the proceedings below the defendant, if financially able, would have had the right to call a privately retained psychiatrist as a witness. It is obvious that only his inability to pay for the services of a psychiatrist prevented a proper presentation of his case. The Supreme Court has unmistakably held that in criminal proceedings it will not tolerate discrimination between indigents and those who possess the means to protect their rights. Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963); Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1961). In the circumstances shown, a substantial question having arisen as to the defendant's mental capacity at the time of trial, the appointment of a psychiatrist at government expense was required.

The handicap under which the court-appointed lawyer was compelled to present the case contrasts markedly with the advantage enjoyed by the Government. While its witness was only a psychologist and not a psychiatrist, he was permitted to offer his opinion on the ultimate issue without affording an opportunity to the petitioner to effectively meet it by a fully informed cross-examination. It is true that Dr. Bryan's examination was made in the regular course of the prison routine, but when he was a witness for the United States in the present proceeding it was in an adversary capacity. On the other hand, Jacobs' position could not be fully developed for lack of available professional assistance.

In the interest of justice, 28 U.S.C.A. § 2106 (1959), the order dismissing the section 2255 motion should therefore be vacated and the case remanded with directions to appoint an independent psychiatrist to examine Jacobs. If, after a further hearing, it should be established that the defendant was mentally competent to stand trial when he pleaded guilty on March 26, 1964, the conviction and judgment based thereon will stand. If it is found that he was then incompetent, the guilty plea must be stricken and the judgment based thereon set aside.

Vacated and remanded for proceedings not inconsistent with this opinion.

BOREMAN, Circuit Judge (dissenting).

This proceeding under 28 U.S.C.A. § 2255 is a collateral attack by civil action upon the judgment of criminal conviction entered in March 1964 upon a plea of guilty by John Buck Jacobs, Jr., to one count of a four-count indictment charging violation of the liquor laws.

The record discloses that the petitioner retained counsel in the winter of 1962 to defend him against the charges contained in the indictment which had been theretofore returned against him. The case was not called for trial until March 26, 1964, at which time the guilty plea was entered. In the interval between the employment of counsel and the trial date counsel conferred with petitioner on numerous occasions. The plea was entered upon advice of counsel and upon the advice of petitioner's younger brother who testified at the hearing below that the petitioner had been caught at an illicit distillery and he believed him to be guilty. The other three counts of the indictment were dismissed, presumably pursuant to understanding and agreement upon the entry of the plea of guilty to one count.

In July of 1964 and within four months after petitioner began serving his sentence he filed a *pro se* petition to vacate and set aside his conviction and sentence upon the principal grounds that he had no recollection of the court proceeding, of any conversation with his counsel, of having entered a plea of guilty and no recollection of having violated any laws of the United States. To partially substantiate these allegations petitioner further alleged that he was declared "mentally unresponsible for his actions in 1950 in the Juvenile Court of Durham County, North Carolina," and that such finding was "still in full force and effect." He further complains that "if" his counsel failed to bring the matter of his incompetency to the attention of the court at the time of his "trial" counsel was "derelict in his duty" and rendered "ineffective assistance." The United States filed a response in which it denied the material allegations of the petition and alleged that petitioner was prior to, during and after his "trial" in full possession of all of his mental faculties and thoroughly understood the charges against him, the crime committed and the plea entered.

The District Court appointed counsel to represent petitioner and ordered a hearing for August 26, 1964, but, by an order entered on August 24, the hearing was postponed until September 4, 1964, to give petitioner's counsel additional time for preparation. The Government was ordered to produce at the hearing the petitioner and all witnesses designated by him. Prior to the hearing petitioner's counsel requested that petitioner be examined by a psychiatrist not connected with the penitentiary and at Government expense. The court informed counsel that if the evidence presented at the hearing should not be sufficient to enable the court to render a proper decision, consideration would be given to the request for a psychiatric examination.

This being a civil action we begin with the proposition that the burden of proof is upon the petitioner to establish the allegations of his petition by a preponderance of evidence. Miller v. United States, 261 F.2d 546, 547 (4 Cir. 1958). Although the petitioner filed his petition *pro se* it may well be that he did not prepare it himself but it is reasonable to assume that it could not have been prepared by a penitentiary "lawyer" except upon information furnished by petitioner. The allegations of the petition are broad and sweeping, disclaiming all knowledge of the court proceeding, the entry of the guilty plea and all recollection of conferences and discussions with counsel. Having made these allegations petitioner did not take the witness stand to give supporting testimony although the truth of the allegations was placed in issue by the pleadings. Perhaps he feared that if he offered himself as a witness he would subject himself to cross-examination and, perhaps, interrogation by the judge who could thereby better form an opinion as to petitioner's mental capacity, good faith and credibility. No excuse or explanation is offered for the petitioner's failure to testify.

Lay witnesses were produced and the court was in a position to observe the witnesses and appraise their credibility. Petitioner's mother testified that she had seen very little of the petitioner during the past fifteen years; that when he was about fourteen years of age he was examined at Duke University; that he had been tried in court on several criminal charges, including a charge of murder in 1953 but she admitted that his mental capacity had never before been questioned in any court proceeding. Another witness was a lady who testified that she had lived in the vicinity of the petitioner from the time he was a small boy until he was about fifteen years old; that there was a "little something wrong" with him particularly when playing with other children; that she had known nothing of the petitioner during the past ten years. Another lady testified that she had previously lived next door to the petitioner for about three years and that on the morning of his trial and on the night following the entry of his plea of

guilty he did not appear to be normal; that his abnormality in the morning consisted of the failure of the petitioner to talk very much and that same night he appeared to be really upset. The length of the sentence may have been upsetting to any one.

The younger brother of the petitioner stated that so far as he had any knowledge the mental competency of the petitioner had never before been questioned. The District Court thought it significant that this brother who had been present in court at the time the plea was entered and who was the person to whom the petitioner often looked for advice gave no testimony whatever concerning the mental capacity of the petitioner at the time of his "trial" or at any other time. One Miss Hanes testified that she had been living with petitioner for several years; that at times he appeared to be normal and at other times abnormal; that on the evening after his "trial" petitioner appeared to be abnormal and she could not make "any sense out of anything he said"; that she had called petitioner's counsel to determine what had happened in court; that she had never known petitioner to have a spell like that before and she thought he was having a heart attack. The interest of these witnesses in the successful outcome of this proceeding was properly to be considered by the court in determining credibility.

The attorney who had been personally retained by the petitioner at the time he entered his plea is described by the District Court as a reputable member of the Durham County Bar whose professional skill and competence are of the highest order and whose integrity and fidelity to the cause of his clients have never been questioned. This attorney testified that after his employment in the fall or winter of 1962 he conferred with the petitioner on many occasions concerning his case and several times during the week of his trial; that the petitioner appeared at all times to be normal and, in his opinion, always understood the nature of the charges contained in the indictment;

that petitioner freely and voluntarily authorized him to enter the plea of guilty to the first count of the indictment; that petitioner was responsive to all questions he had ever asked him and was coherent in all his conversations before, during and after his trial; that there was never anything that even suggested that petitioner was not mentally competent and that he had known petitioner since 1950.

The Government offered the testimony of Doctor Bryan, a clinical psychologist at the United States penitentiary in Atlanta, Georgia, the institution where the petitioner had been since the date of his sentencing. Doctor Bryan was admitted to be an expert. He saw and examined petitioner shortly after his admission to the institution and testified that he made studies of petitioner's intelligence, including a profile of what is known as the Minnesota Multiphasic Personality Inventory. The purpose of this test was to determine whether the petitioner was feigning an illness and the test was conducted over a period of several days. He concluded, and so stated, that the petitioner "was intentionally distorting his responses to give an unjustified impression of being mentally ill." Doctor Bryan found the petitioner to be somewhat inferior in intelligence but certainly "not mentally deficient or feeble-minded, or anything of that sort, and that he quite possibly had some handicap of emotional instability * * * that is functional rather than psychological in cause or origin."

I now advert to the petitioner's allegation that in 1950 he had been judicially declared mentally irresponsible for his actions and that such finding was still in effect which allegation was shown to be untrue. There appears to be no question that petitioner then had a behavior problem as he had several brushes with the law and, as a juvenile delinquent, was sent to the Duke University Hospital when he was thirteen years of age by the Durham Juvenile Court for aid in evaluating his delinquent behavior. He was there on two or three different occasions and after the recommendation of

the hospital that petitioner should work on the farm of his parents, continue certain medication and abstain from the use of alcohol the final report was that the petitioner's behavior was characterized by "running away from home, drinking, lying, and cruelty to animals." It was then recommended that petitioner be committed to a designated institution for juvenile delinquents but there was no judicial finding or declaration of mental incapacity or irresponsibility.

Of particular pertinence to the question here raised is a portion of the written opinion of the District Judge but which is not mentioned in the majority opinion. It reads as follows:

"The petitioner is twenty-nine years of age. His arraignment and trial is well remembered by the court. In response to questions propounded at the time of the arraignment, the petitioner advised the court that he had received a copy of the indictment and had read same, or had it read to him by his attorney; that he had discussed the charges with his attorney; that he believed and felt that he understood the nature of the charges contained in the indictment, and all the accusations made against him in the case; that he had told his attorney all the facts and circumstances concerning the matters mentioned in the indictment, and felt that his attorney was fully informed as to such facts and circumstances; that he understood the maximum penalty, both in the form of fine and imprisonment, which the court might impose against him upon his plea of guilty to the charges contained in the first count in the indictment; that he had authorized his attorney to enter a plea of guilty to the first count in the indictment; that no one had made any threats or promises or suggestions of any kind to him, or with his knowledge to anyone else, to induce him to plead guilty to the first count in the indictment; that no one had promised him that he would receive a lighter sentence, or probation or any other form of lenience, if he entered a plea of guilty to the first count; that he understood that the court would not accept a plea of guilty from anyone who claimed to be innocent, and that he made no claim of innocence to the charges contained in the first count of the indictment; that he entered a plea of guilty to the first count freely and voluntarily and of his own accord after a full knowledge and understanding of the charges and accusations made against him, and that it was his desire that the court accept the plea of guilty which had been entered on his behalf by his attorney. The petitioner's attorney also assured the court that he had read and explained the charges and accusations in the indictment to the petitioner, and that it was his belief that the petitioner fully understood the nature of the charges; that he had informed the petitioner as to the consequences of his plea of guilty to the first count, and that the petitioner had authorized him to enter a plea of guilty to that count; that the plea of guilty was in accord with his understanding of the facts as related to him by the petitioner, and was consistent with his advice to the petitioner; that it was his considered and informed opinion that the plea of guilty to the first count was freely and understandingly made by the petitioner; and that it was his recommendation that the petitioner be permitted to plead guilty to the first count.

"The petitioner had every appearance of being a perfectly normal individual, and there was not the slightest indication at the time of the arraignment or trial, or at any other time, that he was not mentally responsible. His responses to questions propounded by the court were clear and coherent, and there was every indication that he was a per-

fectly normal individual throughout the entire proceeding."

The granting or refusing of an independent psychiatric examination of the petitioner at Government expense was, in my opinion, a matter which was within the exercise of the sound discretion of the court and as I am not convinced that the court abused its discretion in refusing the request, I would affirm.