Michael KNIGHT, Appellant,

v.

The STATE of Texas, Appellee.

No. 49661.

Court of Criminal Appeals of Texas.

May 21, 1975.

Rehearing Denied July 14, 1976.

Charles A. Allen, Ronald Ned Dennis, Marshall, for appellant.

Sam Baxter, Dist. Atty., Marshall, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

OPINION

DAVIS, Commissioner.

Appeal is taken from a conviction for murder. Punishment was assessed by the jury at life.

Appellant's initial contentions are directed to the preliminary trial on the issue of appellant's present sanity. In November, 1972, a preliminary trial on the question of present sanity was held, at which the appellant was found presently insane and was committed to the Rusk State Hospital. On July 2, 1973, the Superintendent of the Rusk State Hospital certified to the trial judge that appellant was then sane. On July 31, 1973, a hearing before a jury was held and appellant was found to be presently sane. Trial began on September 17, 1973. Appellant's contentions are directed to the court's charge, the order of arguments and the prosecutor's argument at the preliminary trial on the issue of appellant's present sanity on July 31, 1973.

■ It has been the consistent holding of this Court that no appeal lies from a judgment rendered in a preliminary trial on the issue of insanity, and any claimed error therein cannot be brought to us after trial and conviction of the offense charged. Therefore, we express no opinion as to matters pertaining to the preliminary hearing to determine competency to stand trial. *Vardas v. State,* Tex.Cr.App., 518 S.W.2d 826; *Kalinec v. State,* Tex.Cr.App., 500 S.W.2d 146; *Peach v. State,* Tex.Cr.App., 498 S.W.2d 192; *Martin v. State,* Tex.Cr. App., 475 S.W.2d 265, certiorari denied, 409 U.S. 1021, 93 S.Ct. 469, 34 L.Ed.2d 312.

Appellant contends the court abused its discretion in failing to grant his motion for change of venue.

On September 5, 1973, a hearing was held on appellant's motion for change of venue based upon the claim that there existed in the county so great a prejudice against him he could not obtain a fair trial because of the widespread publicity concerning the case. The motion was supported by the affidavits of E. N. Smith, Jr., who had previously served as counsel for appellant in this case under court appointment, and Charles Thompson, news director for a Marshall radio station. See Art. 31.03, Vernon's Ann.C.C.P. A controverting affidavit was filed by District Attorney Vernard Solomon attacking the means of knowledge of compurgators. See Art. 31.04, Vernon's Ann.C. C.P.

■ Smith and Thompson testified regarding the coverage by the news media. Thompson was not sure that there has been television coverage, but knew that some of the news stories had been on the front page. There is no suggestion that the publicity by the news media was unfair or inflammatory. The fact of publicity in the news media does not by itself establish prejudice or require a change of venue. *Garcia v. State,* Tex.Cr.App., 513 S.W.2d 82; *Creel v. State,* Tex.Cr.App., 493 S.W.2d 814. Appellant points to the fact that five of the persons selected to serve on the jury had previously heard or read about the case.

In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, the United States Supreme Court stated:

"It is not required, however, that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."

■ In the instant case, there is no showing that publicity created a prejudice so great as to prevent a fair trial. We conclude that appellant has not shown an abuse of discretion by the trial court in denying the motion for change of venue.

■ Appellant contends that the court erred in failing to grant his motion for instructed verdict in that the State failed to prove cause of death.

Juanita Post, daughter-in-law of the deceased, Thelma Post, was in the O'Jay's Cafe on Highway 59 in Harrison County, operated by the deceased, on the afternoon of May 31, 1972, until a little after 3:00 p.m. When she left to go to her husband's store, located next door to the cafe, Mrs. Post observed that appellant was in the cafe playing pool. Upon reaching the store, Mrs. Post and her husband decided to "go get something to eat so me and Mamma [deceased] could eat." Upon returning to the cafe, a sign was in the door, "Sorry, Closed," and the door was locked. Mrs. Post went to the store to get a key to unlock the cafe, and her husband, Parley Post, son of the deceased, went to their nearby home. Upon entry of the cafe, Mrs. Post found the register where the money was kept in "disorder." When the deceased did not respond to her call, Mrs. Post went to the bathroom and found the body of the deceased on the floor. Mrs. Post screamed "bloody murder," and at this juncture appellant "jumped out behind my back and started running around the cafe—and got away." Parley Post was summoned from his nearby home. Post testified that after his arrival at the cafe until the time the ambulance arrived, "I never could see any life in her [deceased]." Post accompanied the deceased to the hospital and stated that she did not respond to oxygen given her en route to the hospital.

Deputy Sheriff Welch arrived at the scene about 4:32 p.m. at a time after the deceased was placed on a stretcher. Welch testified that he had extensive training in first aid during twenty years spent in the military. He stated that his examination of deceased failed to reflect any pulse or vital signs.

Appellant was arrested in Shreveport several days later.

Appellant's written confession was introduced into evidence. The portion of the confession germane to the sufficiency issue reads as follows:

"On May 31, 1972, I was going to hitch-hike to Texarkana, Texas and my uncle, Randal Knight, drove me out to Highway 59 and let me out so that I could hitch-hike. This was approximately 12:30 to 12:45. However, I then went back down the road to O'Jay's Cafe and got there at approximately 1:00 o'clock PM. At this time I had approximately $7.00 on me. When I first arrived, there were two (2) ladies in the cafe.

"I stayed at the cafe all afternoon up until approximately 3:45 to 4:00 o'clock PM. During the afternoon, the second lady in the business left and left me alone with the deceased. During the afternoon I mainly played pool, talked with Mrs. Post and played the juke box. At approximately 4:00 o'clock that afternoon, while I was alone with Mrs. Post, we were sitting at a table beside the pool table, and I ask Mrs. Post to get me some change. She got up from the table, turned her back to me and started to walk to the cash register. I then grabbed her from behind with my right arm over her right shoulder, the forearm against her neck and my right hand above her left shoulder whereupon I grabbed my right hand with my left hand and pulled back. This is the way I had been trained to grab a person for a strangle hold in the Marine Corps. By pulling back with my left hand on my right hand I was able to apply pressure to her throat. I choked her for approximately ten seconds or until she was unconscious and then let her down to the floor. I then drug her back into the rest room and could see that she was still breathing. I think I remember her mumbling something. However, she had not moved and had not said anything to me after I had choked her. During the struggle her glasses had fallen to the floor.

"I then picked up her glasses and walked to the back of the cafe into the area of the kitchen and threw her glasses into some water. And then I got a towel to wipe my forehead because I was sweating. I then back into the cafe and went up to the cash register, where her purse was located and took the money from her purse that was just wadded up in it, and the money from the cash register. I had

locked the door prior to this and had placed a closed sign in the window. After getting the money out of the purse and cash register, the lady that had been there prior that afternoon, came to the door and tried to get in. I was standing against the wall, next to the door where she could not see me. But, I could see and tell who she was. She then left the door and came back after a short period of time. She unlocked the door and came back after a short period of time. She unlocked the door and came inside and looked around. I do not remember whether she walked over to the bathroom and tried to open it or walked behind the counter where the cash register was. However, she did then turn and run out the front door. I waited approximately twenty seconds and ran out the door behind her. I could tell that she had gone to my right and was approximately thirty yards from me if not further. I then turned and ran to my left down the road to a Serve-Yourself Filling Station. I caught a ride with two (2) colored individuals, in a truck who brought me to Marshall and let me out on a street, at a filling station. I went into the restroom at the filling station and sort of straightened the money. Then I came out and walked directly across the street to a Used Car Lot.

"At the Used Car Lot, I purchased a yellow automobile and paid $530.00 from the money that I had taken at O'Jay's Cafe in the robbery. I then drove from the Used Car Lot west to Hallsville, Texas and then turned and got onto Interstate 20 and went to Shreveport, Louisiana. I arrived in Shreveport approximately 5:30 the same afternoon.

"I have been in Shreveport the entire time since May 31, 1972 staying with a friend."

Dr. Jerry Gullion testified that deceased was dead when he saw her at 5:00 p.m. on May 31, 1972, and that she had been dead "probably more than twenty minutes." Dr. Gullion observed, "She had a band-line impression around her neck. . . ." An examination failed to reveal anything unusual about the deceased's body that would indicate a cause of death "other than the bruises on the throat." No autopsy was performed and the following testimony of Dr. Gullion would appear to reflect his conclusion regarding cause of death.

"The only explanation I could readily give was possible strangulation. That's not to say that it was strangulation that killed her."

In *Martinez v. State*, Tex.Cr.App., 507 S.W.2d 223, this Court held that medical examiner's testimony that murder victim's wounds could have been caused by glass, combined with testimony that defendant said he jabbed or hit the victim with a bottle, was sufficient for the jury to find that the victim died as a result of cutting or stabbing with a broken bottle as alleged in the indictment. See *Gonzales v. State*, Tex. Cr.App., 505 S.W.2d 819; *Turner v. State*, Tex.Cr.App., 505 S.W.2d 558; *Duff v. State*, Tex.Cr.App., 503 S.W.2d 785.

We reject appellant's contention that the court erred in denying his motion for instructed verdict. We find the evidence sufficient for the jury to find that the victim died as the result of appellant "strangling her with his hands and arms around and upon the throat," as alleged in the indictment.

Appellant contends the court erred in failing to grant his requested instruction on circumstantial evidence for the reason that there is no direct evidence as to the cause of death of the deceased.

■ A charge on circumstantial evidence need not be given where there is an admission or a confession by the accused admitting he killed the deceased. *Steel v. State*, Tex.Cr.App., 459 S.W.2d 649; *Corbett v. State*, Tex.Cr.App., 493 S.W.2d 940; *Hogan v. State*, Tex.Cr.App., 496 S.W.2d 594.

■ While it may be correctly argued that appellant's confession is not a full admission of the crime in question, such confession must be considered in the light of all the other evidence. *Steel v. State, supra*; *Hogan v. State, supra*.

■ Appellant admitted he grabbed the deceased in the manner he "had been trained to grab a person for a strangle hold in the Marine Corps" and "choked her for approximately ten seconds *or* until she was unconscious and then let her down to the floor [emphasis supplied]." Before appellant could leave the premises, Mrs. Juanita Post had arrived, found the deceased and called her husband, who was in their nearby home. Parley Post determined that the deceased had no pulse or vital signs in a matter of minutes following the act described by appellant. The deceased was taken to the hospital and pronounced dead. When these facts are coupled with the appellant's confession, we conclude the court did not err in failing to charge on circumstantial evidence. *Steel v. State, supra; Hogan v. State, supra.* Further, we find no error in the court failing to affirmatively charge on cause of death.

■ Appellant contends the court erred in refusing to grant his requested charge on intent to kill.

The record reflects that the court instructed the jury as follows:

"You are instructed that an intent to kill is an essential element of murder. Therefore, although you may believe from the evidence beyond a reasonable doubt that the defendant did kill Thelma Alice Post by strangling her with his hands and arms upon and around the throat, yet, unless you further believe from the evidence beyond a reasonable doubt that in so doing the defendant then and there had the intent to kill the deceased, then you cannot convict him of murder; and if you do not so believe from the evidence beyond a reasonable doubt, then you will acquit the defendant of murder, and will consider whether or not he is guilty of aggravated assault."

We find the foregoing to be essentially the same instruction requested by appellant and conclude that the charge given adequately protected appellant's rights on the issue of intent to kill. See *Pelton v. State,* 167 Tex.Cr.R. 649, 322 S.W.2d 529. See McClung's Jury Charges for Texas Criminal Practice, p. 216.

Appellant contends the court erred in admitting the confession into evidence.

■ The thrust of appellant's contention appears to be that the statement was a recitation by the district attorney rather than a statement of the accused. Appellant points to the fact that the statement refers to the victim as "the deceased" and urges that it would have been most unusual for the appellant to use such term. This Court has held so long as a confession is voluntarily made, it is admissible, though in reducing it to writing the identical words of the accused are not used. *DeLeon v. State,* Tex.Cr.App., 500 S.W.2d 862; *Garcia v. State,* 162 Tex.Cr.R. 594, 288 S.W.2d 513. Other contentions regarding the confession constitute nothing more than general statements concerning the confession, are neither discussed nor briefed, and present nothing for review. Article 40.09, Sec. 9, V.A.C.C.P.

Appellant contends the court erred in refusing to grant his motion for a medical examination to determine if he had a chromosomal abnormality.

Appellant argues that recently developed medical information indicates that an individual with the "XYY Syndrome" may, because of his chromosomal abnormality, be more aggressive and violent than an individual with a normal chromosomal makeup.

Appellant's motion requested that "at least $1,000.00 be allowed for the medical examination and tests" and that an order be entered that the county bear the expense for said tests.

Dr. Lake Littlejohn was called as a witness by appellant. The record reflects that Dr. Littlejohn was licensed to practice psychiatry, having received psychiatric training at Baylor University from "sixty-four to sixty-seven." Dr. Littlejohn testified that he had seen appellant five times, that he had the benefit of "work-ups" by a number of psychiatrists and psychologists who had examined appellant, and had obtained the history of appellant from various sources.

Dr. Littlejohn expressed the opinion that appellant did not have "a premeditated plan" to take a human life at the time in question.

Article 46.02, Section 2(f), V.A.C.C.P. provides that:

"The court may, at its discretion appoint disinterested qualified experts to examine the defendant with regard to his present competency to stand trial and as to his present sanity, and to testify thereto at any trial or hearing in connection to the accusation against the accused. . ."

 We find that the trial court did not abuse its discretion in denying appellant's motion. *Hogan v. State, supra.* Further, we conclude that the failure to grant appellant's motion did not result in appellant being denied a fair trial or effective assistance of counsel. See and cf. *McCollum v. Bush,* 344 F.2d 672 (5th Cir., 1965); *Jacobs v. United States,* 350 F.2d 571 (4th Cir., 1965).

The judgment is affirmed.

Opinion approved by the Court.