Armando ELLIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 53217.

Court of Criminal Appeals of Texas.

June 1, 1977.

James R. Lawrence and Arnold X. Medina, Corpus Christi, for appellant.

William B. Mobley, Jr., Dist. Atty., J. Grant Jones, Asst. Dist. Atty., Corpus Christi, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

GREEN, Commissioner.

In a trial before a jury, appellant was convicted of murder. Punishment was assessed at life.

In his first ground of error, appellant complains of the court's failure to include in its charge to the jury instructions on the law of circumstantial evidence. Appellant timely in writing objected to the omission of such instruction, which objection was overruled by the court prior to the reading of the charge to the jury. We conclude from the evidence that the court erred in refusing to charge on circumstantial evidence, and reverse the judgment.

The evidence reflects the following in connection with the death of the deceased:

About 9:15 a. m. July 9, 1975, the lifeless body of a young woman later identified as Jeanne Singh, hereafter called deceased, was found just off of Hiensen Road in Nueces County in a field. Police officers in Corpus Christi were notified and arrived at the scene in about five minutes. Deceased's head was badly beaten and showed that it had received many blows with a blunt instrument. The body was taken to the morgue in Corpus Christi. An examination by Dr. Joseph C. Rupp, medical examiner of Nueces County, established that her head was beaten "to a pulp" and death was caused by a number of blows to the head with a blunt instrument, such as a metal tire tool.

Elizabeth Hernandez, a waitress and bartender at the Party Doll Lounge in Corpus Christi, testified that appellant, deceased and Robert Arguijo were in the lounge during the evening of July 8, 1975. Witness Hernandez and deceased had each taken an "acid" pill, and deceased felt "high" and very playful. Hernandez stated, "She was the kind of girl that like to, you know, play around with everybody, you know." The witness saw appellant place his hands on deceased's breasts and between her legs, at which time she pushed him away. She told appellant she wanted to go home, and he offered to take her. Deceased and Arguijo then left the interior of the lounge, and appellant followed in about ten minutes.

Appellant's written confession given to Police Lieutenant Perez in the early morning of July 11 was introduced in evidence in part by the State and then in its entirety by appellant. The State relies on the confession as producing direct evidence of appellant's participation in the murder as a party criminally responsible for the conduct of another. See V.T.C.A. Penal Code, Sec. 7.02(a)(2).

Omitting the acknowledgment of the Miranda and statutory warnings and preliminary statements not evidentiary of the of-

fense, we copy below the confession as introduced. The word "State" immediately precedes the portions placed in evidence by the State; the word "Appellant" precedes the parts not offered by the State, but introduced by appellant.

Appellant first tells about his riding around in Corpus Christi in Pato's car with his friend "Pato" (his nickname for Robert Arguijo) and a girl who left the car at a street corner in Corpus Christi, and then about him and Pato going to the Party Doll Lounge about 11:30 p. m. and meeting Jeanne Singh (deceased) with whom Pato had a conversation, and then continues:

(State): "Pato then came up to me and asked me if I was ready to go and we started walking out the door and Jeanne followed us outside and Pato got in the driver's side, Jeanne in the middle and I got in the passenger's side. Pato owns a blue Pontiac or a Buick and this is the car we left in. I told Pato to go by Greenwood and Baldwin so we could buy some beer. This was around 12 a. m. I went inside the Circle K and bought a six pack of Schlitz beer and Pato and Jeanne stayed in the car. From the Cirle (sic) K, we drove down Baldwin and got on the Freeway toward the high bridge.

(Appellant): "As we got to the high bridge, this is when everything started. Pato started putting his hand under Jeanne's dress and Jeanne said, 'Quit it, take me home.' Pato kept feeling her off and Jeanne kept pushing his hands away. Pato stopped feeling her and kept driving until we got to a lonely road by the docks. We got out of the car and Pato told Jeanne to get in the back seat. While Pato was on top of Jeanne, a car was driving toward our car and Pato got up and pulled up his pants. He told Jeanne to stay in the back and to shut up or 'I'll kill you.' Jeanne got real scared and she kept asking me, 'Is he really going to kill me.'

(State): "As the car approached toward our car, Pato got in and we drove toward the lift bridge on Navigation. Before we got to the left bridge, Pato stopped the car and forced Jeanne to get in the front seat.

(Appellant): "Jeanne kept repeating, 'Is he really going to kill me?' 'Please don't let him do it.' She asked me several times and I kept telling her, 'I don't think he'll kill you, but I don't know what he is going to do.' While Jeanne kept asking if Pato was going to kill her, Pato kept saying, 'Shut up or I'll kill you.'

(State): "We drove down Navigation and we went over the left bridge and then from there I don't know where we went to because Pato drove to back roads and then it was too dark to tell where we were. He drove to a lonely road where it was real dark and he parked. I got out of the car and went to the rear of the car. Pato got out and went around the front of the car and met Jeanne as she was getting out of the passenger side of the car.

(Appellant): "Pato started beating her up and Jeanne fell to the ground and he started kicking her in the face and all over her body and at the same time Pato was pulling Jeanne's clothing off and I saw Pato had Jeanne's bra in his hand and then Pato raped Jeanne again. Jeanne kept her hands over her face and I kept telling Pato, 'Please, Please spare my life and I'll do anything you want.' I got so afraid that I did not know what to do, but Pato just kept hitting her and raping her. The first time Pato started beating Jeanne, it was close to the car about four or five feet away. Finally, Pato got up and he went to the car and got a crow bar out of the back of the car and Jeanne got up and started running toward the field. Pato said, 'Stop her, stop her,' but I could not do anything because I was afraid. Pato then started running after Jeanne with the crow bar and Jeanne was screaming, 'Help, Help! Please help me,' and started begging to 'Please Spare my life.' Jeanne fell down while running and Pato got up to her and started beating Jeanne with a crow bar. Jeanne again said, 'Please spare my life,' and then she was quiet. I could not believe I had never seen anyone beat up

so bad in my life. I wanted to tell Pato to quit hitting her, but I could not say anything. I was shocked seeing Pato hitting her so many times. Pato said, 'I have to kill her.' Then Pato stopped hitting Jeanne and said, 'let's get in the car.' I could not move and Pato again said, 'Get in the car and don't say anything and you don't know nothing.' I saw Pato put the crow bar in the car, but I don't know what happened to Jeanne's bra and panties. We drove off and Pato told me twice, 'You don't know nothing and keep your mouth shut.'

(State): "Pato took me home and dropped me at Lugo's on Ayers. I went to the garage and turned the light on and Mr. Lugo came out and he asked me if I wanted to shower and eat and I said 'No' and I went to bed. Around 7:30 a. m., July 9th, 1975, Mr. Lugo woke me up and I noticed that I had blood spots on my pants, so I changed clothing and I placed the blood stained pants under a table close to the telephone, which is in the back of the garage. The pants are still there and you can get them. I went to work that day, Wednesday, July 9th, 1975. I kept thinking of what happened and I could not eat. On Thursday, July 10th, 1975, it was around 9:20 p. m. that I went to Wiggens Park on 19th Street. I was sitting on a bench, when I saw a detective and then two more and I started running toward Memorial Hospital. The police started chasing me and I went over a fence and I cut my hand. The police finally caught me and placed me under arrest. I was placed in a police car and a detective told me my rights. I was brought to the police station and booked and again warned of my rights and Lt. Perez asked me if I wanted to give a statement. I started telling Lt. Perez a bunch of lies and he stopped questioning me and was taken upstairs and placed in jail.

(Appellant): "I kept thinking about it and I decided to tell the truth. Lt. Perez came over to talk to me upstairs and I decided to tell him the truth after I understood my rights and after being told that I did not have to make a statement, but I wanted to tell the truth.

(State): "This statement is true and correct to the best of my knowledge and no promises or threats have been made to me."

On July 10, police officers received information which caused them to look for appellant. When Officers Stivor and Harmon saw him near a park, appellant ran. Stivor and Harmon were unable to catch him, but Officer Tovar became involved in the chase and succeeded in arresting appellant.

Officer Roberts testified that after securing consent from appellant and the owner, Lugo, he searched Lugo's upholstery shop on Ayers Street (see the reference to the shop in appellant's confession) and took therefrom a pair of trousers (S.Ex. 25) and a sweater (S.Ex. 26). A chemist found a few specks of human blood on the trousers, not identified as to type, which could have been blood splattered from a short distance, and no blood on the sweater. A single hair was found on the sweater, similar to hair taken from deceased's head at the morgue.

Other evidence introduced by the State was that hairs taken at the morgue from deceased's hands and fingernails matched her own hair; hair taken from Arguijo did not match these hairs; human blood was found on deceased's blouse and skirt; no blood was found on a tire tool turned over to the police by Arguijo, and no blood was on his clothes.

No one testified as an eyewitness to anything that occurred involving appellant, Arguijo, and deceased after they left the Party Doll Lounge. Except for appellant's written statement, supra, there was no evidence of any statements made by appellant or by his companion Arguijo.

In its brief, after reciting appellant's statements in his confession,

"The State contends that these admissions by the Appellant coupled with the evidence that he had been seen making sexual advances toward the victim on the night of the killing; that the blood found on his trousers was human blood; that a

hair found inside of his sweater was similar to the hair from the victim; that he had tried to hide his trousers; and that when approached by the police he had fled, amount to direct evidence that Appellant was a guilty participant in the murder of the victim. Such evidence also is sufficient to sustain the jury's verdict of guilty for Murder."

 The court charged on the law of criminal responsibility for the conduct of another (V.T.C.A. Penal Code, Sec. 7.02(a)(2)) but refused to charge on circumstantial evidence. An instruction on the law of principals under the former Code, or criminal responsibility for the conduct of another under Sec. 7.02, supra, is a State's charge, and does not protect a defendant's rights. An instruction on criminal responsibility or principals does not eliminate the necessity for a charge on circumstantial evidence if circumstantial evidence is relied upon to establish the guilt of accused. *Ransonette v. State* (opinion on motion for rehearing), 550 S.W.2d 36 (1977).

In finding that there was direct evidence of the defendant's participation in the offense of which he was convicted, this Court on rehearing in *Ransonette*, supra, stated:

"A charge on circumstantial evidence is required only where the evidence of the main fact essential to guilt is purely and entirely circumstantial. See e. g. *Wilson v. State*, 154 Tex.Cr.R. 59, 225 S.W.2d 173 (1949). A charge on circumstantial evidence is necessary only when the State's case depends entirely upon circumstances for conviction. See e. g., *Nailing v. State*, 152 Tex.Cr.R. 161, 211 S.W.2d 757 (1948); *Wells v. State*, 134 Tex.Cr.R. 412, 115 S.W.2d 658 (1938). An instruction as to circumstantial evidence need not be given where the State relies only in part on circumstantial evidence, *Lawler v. State*, 110 Tex.Cr.R. 460, 9 S.W.2d 259 (1927); *Coleman v. State*, 90 Tex.Cr.R. 297, 235 S.W. 898 (1921), even though the State relies on a chain of circumstances that may be considered the major part of the evidence on which the State relies for conviction. *Dodd v. State*, 149 Tex.Cr.R.

278, 192 S.W.2d 263 (1946). See 31 Tex. Jur.2d 682–683, Instructions, Sec. 123; *Morris v. State*, 402 S.W.2d 161 (Tex.Cr. App.1966); *Russell v. State*, 396 S.W.2d 117 (Tex.Cr.App.1965)."

In *Hielscher v. State*, Tex.Cr.App., 511 S.W.2d 305, this Court on the legal issue of whether a confession or admission is direct or circumstantial evidence said:

"It is well established that proof of an accused making an unequivocal admission or confession of the offense charged is direct and not circumstantial evidence of the main inculpatory fact, and a charge on circumstantial evidence is not required when proof of such admission or confession is in evidence. 4 Branch's Ann.P. C.2d ed., Sec. 2050, p. 358; 31 Tex.Jur.2d, Instructions, Sec. 123, p. 688; *Patterson v. State*, 416 S.W.2d 816, 819 (Tex.Cr.App. 1967). *It is true that admission or confession must unequivocally admit the commission of the act charged before the court is relieved of the necessity of giving a charge of this character.* See 31 Tex. Jur.2d, Instructions, Sec. 123, p. 689. See *Martinez v. State*, 151 Tex.Cr.R. 316, 207 S.W.2d 387 (1948)." (Emphasis added).

See also *Knight v. State*, Tex.Cr.App., 538 S.W.2d 101; *Casey v. State*, Tex.Cr.App., 523 S.W.2d 658.

There is no direct evidence in appellant's written statement that appellant admitted killing deceased or that "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense" (Sec. 7.02(a)(2) of V.T.C.A. Penal Code, supra). In fact, in the portion of the statement introduced by the State there is no evidence that deceased was killed or even assaulted. The portions introduced by appellant were, of course, in evidence for whatever they may show; however, there is no admission by appellant that he committed or solicited, encouraged, directed or aided or attempted to aid another in the commission of the offense of assault, or rape, or murder. By the remainder of the evidence, the State attempted by pure circumstances such as flight, a hair on

his sweater, scattered blood on his pants, her own hair found in deceased's hands as though she was attempting to protect herself, etc., to connect appellant with deceased's murder.

The presence of appellant during the commission of an offense is not by itself direct evidence of his participation in the crime. *McBride v. State,* Tex.Cr.App., 486 S.W.2d 318; *McCormick v. State,* 168 Tex. Cr.R. 489, 329 S.W.2d 436; *Burleson v. State,* 132 Tex.Cr.R. 2, 101 S.W.2d 1020; *Anderson v. State,* 85 Tex.Cr.R. 411, 213 S.W. 639.

There being a total lack of direct evidence of appellant's participation in the offense, either personally or as criminally responsible for the conduct of Robert Arguijo, the trial court reversibly erred in refusing to charge on the law of circumstantial evidence. Having so concluded, it is not necessary that we pass on appellant's contention of insufficient evidence to sustain the verdict.

The judgment is reversed and the cause is remanded.

Opinion approved by the Court.