

**COURT OF APPEALS**
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-11-00311-CR**


FRED EARL INGERSON, III                                                  APPELLANT

V.

THE STATE OF TEXAS                                                              STATE


----------

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
TRIAL COURT NO. CR11514

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

A jury found appellant Fred Earl Ingerson, III guilty of the offense of capital murder and assessed his punishment at life without parole in the Institutional Division of the Texas Department of Criminal Justice. The trial court sentenced him accordingly. In four points, Ingerson argues that the evidence is insufficient to support the jury's verdict; that the trial court erred by allowing the State to

---

[1]*See* Tex. R. App. P. 47.4.

introduce extraneous-offense evidence; and that the trial court erred by not allowing him to introduce evidence that "another person may have had a motive to commit the killings." We will reverse and render a judgment of acquittal.

## II. BACKGROUND

On June 28, 2008, Robyn Richter and Shawna Ferris were found dead in the parking lot of the Miyako Japanese Restaurant in Granbury, Hood County, Texas. They were discovered in the front seats of a GMC Envoy—Richter in the driver seat and Ferris in the passenger seat. Each had suffered a single gunshot wound to the head and had been shot from the passenger side of the vehicle.

The Granbury Police Department and the Texas Rangers performed an extensive investigation of these murders. It was not until March of 2010 that law enforcement obtained a warrant for Ingerson's arrest.

## III. TRIAL TESTIMONY

The State called forty-six witnesses in its presentation of its case in chief, and the defense called seven witnesses. The State called four rebuttal witnesses. We will briefly identify the testimony of each witness in order to thoroughly consider the sufficiency-of-the-evidence question raised by Ingerson in his first point.

**State's Witness Kenneth Barnes:**

The first witness was Kenneth Barnes, who testified that he is an employee in the City of Granbury's IT Department and said that his duties in the IT Department included recovering video data from surveillance systems. Barnes

2

said that he gathered video from the Little Miracles Creative Learning Center's surveillance system on June 30, 2008, and that this data constituted State's Exhibit 1. According to Barnes, the video contained in State's Exhibit 1 captured video spanning from 11:30 p.m. on June 27 to 12:30 a.m. on June 28. While on the stand, Barnes did not mention Ingerson's name.

**State's Witness Shelly Roop:**

The second witness to testify was Shelly Roop. Roop averred that she was the former owner of the Little Miracles Creative Learning Center and testified to the reliability of the daycare's video system. She also did not mention Ingerson.

**State's Witness Russell Grizzard:**

Witness number three was Russell Grizzard, who testified that he is a detective with the Granbury Police Department. Grizzard averred that he was the first detective to arrive at the scene who took photographs of the bodies. He said that he made an initial search of the scene and that he looked for but found no shell casings. Grizzard stayed at the crime scene until the crime scene investigation team arrived. After the car was opened, Grizzard averred that he found Richter's cellphone. According to Grizzard, the last outgoing call shown on the cellphone was made at 11:52 p.m. and lasted until 11:53 p.m., which Grizzard said he believed showed that the time of death was after 11:53 p.m.

Grizzard averred that a fellow investigator, Richie Haught, had interviewed "everyone [who] was at the bar at Miyako's the night before" the murders were

discovered. According to Grizzard, based on Haught's initial interview with Ingerson, it was determined that investigators "needed to talk to [Ingerson] a second time." Grizzard said that he and Texas Ranger Danny Briley went to Ingerson's home, but that Ingerson was not there. Grizzard said that while there, however, Briley spoke to Ingerson by telephone. By Grizzard's account, Ingerson agreed to go to the Granbury Police Department and was interviewed on Saturday, June 28, 2008.

During this interview, Grizzard said that he asked Ingerson what he was wearing while he was at Miyoka on the night before the bodies were discovered. Grizzard testified that Ingerson gave him permission to retrieve the pants he said he had worn from a local cleaners. Based on this, Grizzard said that Haught called the owner of the cleaners, who agreed to retrieve Ingerson's pants.

Grizzard testified that Ingerson initially told him that he believed that he had left Miyako at about 10:50 to 11:00 p.m. on Friday. Grizzard said that Ingerson corrected that timeframe when he was told about statements from other people who were at the bar having said that it was around 11:30 p.m. and that Ingerson conceded that that was the more correct time of his departure, saying he left with everyone else when the bar closed. Grizzard testified that the Little Miracles's surveillance video showed a car similar to Ingerson's drive by its location within minutes after the last outgoing call on Richter's cellphone.

Later, while at Ingerson's home, Grizzard said that he and Briley obtained permission to search Ingerson's car. No weapons were found in the car. They

4

also asked to look at the weapons in Ingerson's home. According to Grizzard, one of the weapons there was a .44 Special Smith & Wesson revolver. Grizzard said that although they were looking for a .38 Colt Special or a .357 Colt, no such gun was found at Ingerson's home.

Grizzard testified that he knew he was looking for a Colt .38 Special or .357 Magnum revolver as he was searching for the murder weapon because of an examination of a projectile found in the back of the vehicle where the bodies were found. According to Grizzard, he had been told this by Calvin Story.[2]

---

[2]The caliber of the projectile was confirmed in a report written by forensic scientist Calvin S. Story, Jr. dated July 15, 2008, and admitted as State's Exhibit 56. As is further discussed below, the report prepared by Story, a forensic scientist for the Firearms Section of the Texas Department of Public Safety in Austin, describes an examination by Story of the bullet projectile found in the back of the Envoy vehicle by crime scene investigators. The projectile and where it was found is depicted in State's Exhibits 33, 34, 35, and 36. Story referenced that projectile as item 11 in his report. Story was the twelfth witness to testify. The State concedes that Story is the expert relied upon in attempting to identify the murder weapon from the bullet projectile found at the murder scene. Contrary to the State's repeated references that the never-located and never-found murder weapon was a Colt .38 Special, the State's controlling expert never narrowed the caliber of gun that fired the projectile found at the crime scene down to a .38 Colt Special. Instead Story's report concluded in part that:

Results of Analysis and Interpretation

1. It is our opinion that this bullet, item 11, was fired from a firearm capable of chambering and firing a .38 Special, .357 Magnum, or .38 Super (Auto) caliber cartridge. A list of possible firearms would include, but not be limited to, .38 Special and .357 Magnum Colt revolvers and a .38 Super (Auto) Colt pistols.

Evidence existed that Ingerson had one time owned a .38 Colt bobbed-hammer pistol. That connection led the State to conclude that the murder weapon was a .38 Colt pistol, and the State presented evidence to this conclusion. But no such pistol was ever located and, accordingly, was not in evidence.

5

Grizzard testified that during the time Story was asked to examine evidence, he sent Story a .38 Special caliber Colt model Cobra revolver that was in the possession of the Granbury police at that time for examination. By Grizzard's account, this gun was obtained from David Hill, who was arrested for a D.W.I., and it was seized as evidence and put in the police department's safekeeping. Story concluded in his report that he was unable to identify or eliminate the Cobra revolver as having fired the bullet found at the scene of the murders.[3]

Grizzard testified that Ingerson reported that he had talked with Richter and Ferris after he came out of the restaurant on Friday, June 27. Grizzard said that his investigation confirmed this in that Ingerson's palm prints and fingerprints were found on the vehicle.[4] However, Grizzard testified that although there was an extensive investigation by investigators taking hair and fiber samples and DNA, there was no biological evidence collected at the crime scene or at Ingerson's home that connected him by forensic evidence to the murders aside from the palm prints and fingerprints. Grizzard did say that investigators found

---

[3]Thus, in addition to the already identified list of ".38 Special and .357 Magnum Colt revolvers and a .38 Super (Auto) caliber cartridge" in Story's report, the list of possible firearms identified by the State's expert witness also included a .38 Special caliber Colt model Cobra revolver.

[4]As discussed further below, other people leaving the bar reported and testified that when they left that night, Ingerson was standing by the side of the vehicle talking to the two women. Moreover, Ingerson's prints were found on the driver's side, which is consistent with his statement to police and with the testimony and statements of other witnesses. Forensic evidence demonstrates that the two victims were shot from the passenger side of the vehicle.

several other palm prints and fingerprints on the vehicle that have never been identified. Grizzard also said that none of the two victims' biological material—including hair, blood, or DNA—were recovered from any of Ingerson's shoes or clothing that investigators tested, including the pants that Ingerson voluntarily allowed investigators to retrieve from the cleaners.

Grizzard also testified that during his investigation he received "information that there were a couple of people [who] made the remark" that they had killed the two women. Specifically, Grizzard said that one person "for sure did make a remark that he killed the girls" and that another person had informed investigators that the murders were related to the "Aryan Circle" but that the informant also said that the murders involved another gang, "Tango Blast." Grizzard also said that he received information that the Aryan Brotherhood had committed the murders. Grizzard said that he did not pursue a lead regarding the Aryan Circle because the information he obtained was that the women were killed with a shotgun and he knew definitely that they were not. Grizzard said that Christopher Tibbs, the individual who claimed to have killed the two women, was investigated and that it was determined that Tibbs did not know relevant details about the murders and that he had lied about his involvement in the murders "to look tough in front of some other people."

**State's Witness Michael Mathew:**

Michael Mathew, who testified that he was sixty years old at the time of trial and a resident of Kingman, Indiana, was the fourth witness. Mathew testified

7

that he was involved in a 1999 transaction in which Ingerson purchased guns from a gun dealer named James Elrod.[5] Mathew said that he delivered two guns to Ingerson at the same time and that he took a check, which had been written on a company account, from Ingerson to pay for them. Mathew said that he then delivered that check to Elrod. Mathew said that one of the guns that he delivered to Ingerson was a Colt and that he remembered that it was because "[y]ou just didn't see many little Colts like that at the time."

**State's Witness James Elrod:**

James Elrod was the fifth witness. Elrod confirmed that he sold a .38 Special bobbed-hammer gun to Ingerson in 1999 through Mathew. He said that he bought the Colt .38 Special revolver at Darrel's Guns, a gun shop in Indiana. During Elrod's time on the stand, the State introduced State's Exhibit 17. Part of State's Exhibit 17 contained a photocopy of the check that Ingerson used to pay for the two guns. Elrod described for the jury how on the check's memo line the word "Door" is written. Elrod said that he knew that the check was written as such at the time and that he "didn't like it" but that because he needed the money, he took and cashed the check.[6] But Elrod averred that the check was the payment for the two guns. Elrod also described how he later signed an

---

[5]Investigators spoke with Sharon Ingerson Hutcheson, Ingerson's ex-wife, on July 8, 2008, and learned that Ingerson had purchased a .38 Colt pistol while he was living in Indiana.

[6]Ingerson's points two and three contend that it was error to admit State's Exhibit 17, the check and notes regarding the check, as extraneous-offense and extraneous-bad-act evidence.

8

affidavit explaining that the check was in fact for the purchase of the guns. A copy of the affidavit makes up the remaining portion of State's Exhibit 17. Elrod also testified that State's Exhibits 18, 19, and 20 are pictures that accurately depict the type of gun that he sold to Ingerson. Elrod described a .38 Special bobbed-hammer pistol as "[n]ot having a hammer."

Elrod averred that he had informed investigators that numerous times he had fired the .38 Special bobbed-hammer pistol that he sold to Ingerson. He also said that he was aware that investigators had retrieved slugs from the place where he had shot the gun.

**State's Witness Darrel W. Stonebraker:**

Darrel W. Stonebraker, who testified that he is the manager of Darrel's Custom Firearms, was witness number six. Stonebraker said that he sold the .38 Colt Detective Special revolver to Elrod. Stonebraker identified State's Exhibit 62 as a Colt advertisement that was admitted into evidence.[7] Stonebraker did not know and could not identify Ingerson.

---

[7]The exhibit displays a picture of a Colt .38 SF VI Special with a hammer that can cock the revolver for firing. Below the picture is printed additional model numbers and includes a model described as SF 1022, Colt .38 SF-V1 Bobbed Hammer. The gun sold to Elrod and later sold to Ingerson was identified as a Colt .38 Special Detective Special, Serial #SV6879—a bobbed-hammer revolver. As later discussed, this evidence identifying the .38 caliber once owned by Ingerson as being bobbed-hammered is inconsistent with the State's theory that a gun seen under the seat of Ingerson's car shortly after the murders—a gun identified by witness Scott Wayman as having an S & W stamp on the grip and as having a hammer—was the murder weapon.

9

**State's Witness Dr. Marc Krouse:**

The seventh witness was Dr. Marc Krouse, whose job it is to investigate deaths in Denton, Parker, Tarrant, and Johnson Counties. He testified that his title is Chief Deputy Medical Examiner and that he is also called on from time to time to perform services for Hood County. Krouse prepared and sponsored for admission the autopsy reports for Richter, State's Exhibit 21, and Ferris, State's Exhibit 24. Krouse testified extensively about the bullet wounds and the condition of the bodies. He testified that the time of Richter's death was between 9:00 p.m. and 2:00 a.m. He presented no evidence concerning Ingerson.

**State's Witness Joe Hutson:**

Witness number eight was Joe Hutson, a former Texas Ranger law officer, whose connection with the case was that in July 2008 he collected six .38 Special jacketed bullets from Ingerson's former wife, Sharon Ingerson Hutcheson. Hutson testified that he put the bullets into an evidence bag that was marked as State's Exhibit 30. Those six bullets were eventually transferred to Story for examination. Hutson had no testimony to give concerning Ingerson other than his picking up the bullets and speaking with Ingerson's ex-wife about the gun that Ingerson had left with her.

**State's Witness Sharon Diane Ingerson Hutcheson:**

Sharon Diane Ingerson Hutcheson was witness number nine. She testified that she retained the .38 Colt Special bobbed-hammer pistol after Ingerson moved back to Texas and while they were getting a divorce. She stated that she

gave the gun back to Ingerson in the first part of June 2006. She identified State's Exhibits 18, 19, and 20—a .38 Colt Detective Special bobbed-hammer revolver—as being pictures looking like the gun that she gave back to Ingerson. She averred that she kept the gun and the bullets separate and that she gave the bullets to Hutson.

**State's Witness Brent Wayne Watson:**

Witness number ten was Brent Wayne Watson. Watson is a forensic scientist in the DNA unit of the Texas Department of Public Safety Crime Laboratory in Waco, Texas. He was one of the crime scene analysts who came to the crime scene on Saturday, June 28. He described his work in the DNA section, stating that he examines physical evidence from crime scenes for any cells or fluids that contain DNA. Watson said that he generates DNA profiles from those cells and fluids. He averred that his job includes doing crime investigations, and he was called to do that in this case.

Watson said that after the bodies were removed from the Envoy, he took photographs of its interior. Watson identified State's Exhibits 32, 33, 34, 35, and 36 as photographs of a projectile that was located in the rear cargo area of the Envoy in which the bodies were found. Watson had the DNA from the bodies of Richter and Ferris as a result of autopsies conducted on their bodies. He said that he obtained DNA evidence from the projectile in State's Exhibit 54 (also

referred to as Item 11) shown in State's Exhibits 33 through 35[8]. Watson concluded that the DNA obtained from the projectile was a DNA match to Ferris.

Watson gave additional testimony about gunshot residue and the technique for gathering gunshot residue evidence. He testified that he collected pads, which he called stubs, that had been pressed against spots on Ingerson's pants that investigators retrieved from the cleaners. Watson did not do the analysis of the gunshot residue stubs; instead, they were sent to Austin for analysis at the DPS Crime Laboratory.

After his initial work at the crime scene and the examination of Ingerson's pants, Watson was called back to Granbury by Texas Ranger Briley on August 28, 2008, to examine and look for gunshot residue from the interior of the Mazda Tribute vehicle that Ingerson drove on June 27 and 28. During Watson's time on the stand, the State introduced photographs of the vehicle—State's Exhibits 45 and 46. The State also introduced State's Exhibits 47, 48, and 49, which Watson said showed the areas of the Mazda that were examined and swabbed in looking for gunshot residue. Watson gave no evidence concerning Ingerson directly.

---

[8]The bullet, put into an evidence bag marked as State's Exhibit 54 and previously shown in the photographs, was the only physical evidence not connected by other evidence to any person who was investigated as part of this murder.

**State's Witness Rose "Sissy" Cardwell:**

Witness number eleven was Rose "Sissy" Cardwell. Cardwell averred that she worked at the tax assessor's office with Richter. According to Cardwell, she and her family were friends with Richter. Cardwell described Richter as a friendly and outgoing person that she went to dinner with on occasion outside of the workplace. Cardwell testified that she saw Ingerson at the tax office on three occasions but that she never met him. She testified that when Ingerson was at the office on one occasion, she was called to the area where Richter was talking with Ingerson. Cardwell said that she observed that Ingerson was about to write a check at the tax assessor's office and that she saw Richter grab his checkbook and overheard Richter say to Ingerson, "Can I write the check? Let me write the check." According to Cardwell, Ingerson said, "No."

Cardwell testified that one day after Ingerson visited the office, Richter was making fun of him and the way he walked. That testimony is as follows:

> [Prosecutor]: I want you to -- I want to direct your attention then again to that day when they're teasing each other about the checkbook and that sort --
>
> [Cardwell]: She wanted to write a check, and, you know, she said, "Let me write that check." And he said, "I don't think so," or something like that, so --
>
> [Prosecutor]: And when he left, did she say anything that indicated her state of mind or her feelings about him?
>
> [Cardwell]: Not about him. She was laughing.
>
> [Prosecutor]: Well, what do you mean?
>
> [Cardwell]: Like poking fun, making fun.

13

[Prosecutor]:   Well, what was funny?

[Cardwell]:   Well, she came over to my office after the fact because I -- because I left, and my sister had been there, she just got there and she met [Richter] that day, and she [came] in the office, laughing, and just making fun.

[Prosecutor]:   Well, how?  What was she making fun of?

[Cardwell]:   How --  what he had on.

[Prosecutor]:   And what did he have on that was funny?

[Cardwell]:   He had khaki pants -- khaki shorts, socks mid-thigh, a white T-shirt with something on it, I don't know what it was, tucked in.  And that was [Richter].  [Richter] just, you know, I hate to say made fun of the way he looked,  because  that's  not  nice,  but -- and  we laughed because she was imitating his walk.

[Prosecutor]:   Like how?

[Cardwell]:   Well, I'm not going to stand up and show y'all.

[Prosecutor]:   Well, that's not exactly what I mean.   But -- but I realize that -- that [Richter] is gone.

[Cardwell]:   Uh-huh.

[Prosecutor]:   And some of these things I'm asking you about her, you don't approve of now, didn't approve of then.

[Cardwell]:   I didn't.

[Prosecutor]:   But it's important for us to understand the nature of this relationship, so don't worry about it.

[Cardwell]:   I understand.  I understand.

[Prosecutor]:   So I need you to tell me what she was saying and how she was acting towards the defendant after he left.  What did she say?

14

[Cardwell]: She had said he was nerdy, and she was making fun of the way he was walking. And [Richter] was just -- she -- she joked about everything, she just kept the office laughing. And, of course, the way she was walking and imitating, it was funny. And I have to say I laughed. I didn't agree, but I have to say I laughed.

[Prosecutor]: That it was funny?

[Cardwell]: Because it was funny to see her do what she did.

. . .

[Prosecutor]: What did you say to her about how she was dating this man [a]nd then making fun of him and the way he looked and the way he walked and the way he acted and that he was nerdy after he left?

[Cardwell]: I had told [Richter] if she wasn't interested in him, to do not lead him on. And she never really said much about that. I just said, "It's wrong, because it's not just a good situation to be in. If you don't like him, don't lead him on. Don't -- don't accept his lunch dates, dinner dates. Anything he offers you, don't -- don't lead him on."

[Prosecutor]: Well, and why did you feel like you needed to tell her that?

[Cardwell]: I guess because that's something that I wouldn't do, and I always told [Richter] that -- I guess being a big sister, mother figure, whatever, she always came to me, and I was very protective of [Richter] and tried to lead her in a way that I feel like I would go.

[Prosecutor]: Well, --

[Cardwell]: I don't --

[Prosecutor]: -- my question -- so I just --just so I understand --

[Cardwell]: Uh-huh.

15

[Prosecutor]: -- your frame of mind and hers, why wouldn't you lead a man on if you weren't interested in him?

[Cardwell]: Why --

. . .

[Prosecutor]: Why wouldn't you do that, Ms. Cardwell?

[Cardwell]: I'm sorry. Can you repeat that again?

[Prosecutor]: Well, why wouldn't you -- why wouldn't you lead a man on --

[Cardwell]: Well, --

[Prosecutor]: -- if you weren't interested in him?

[Cardwell]: -- I just wouldn't want to deal with the fact that if I did continue to lead him on, what might happen. I don't -- I don't know.

[Prosecutor]: And were you concerned about [Richter] in that regard?

[Cardwell]: I have to say I was, yeah.

[Prosecutor]: Now this -- this exchange that you're talking about, to where he comes into the tax office and he calls -- she calls a girlfriend also to look at him and then flirts with him and then makes fun of him as he leaves -- left, what day was that?

[Cardwell]: Oh, my goodness. I want to say it was probably maybe late April and May.

[Prosecutor]: Okay. And -- now, I want to ask you about, did you have any interaction with her about [Ingerson] the day that she died?

[Cardwell]: Other than what I just told you, is that what you're talking about?

[Prosecutor]: Yes.

16

[Cardwell]:      No, I mean just --

[Prosecutor]:    Well, I'm a little confused.  Did you have this conversation with [Richter] about not leading [Ingerson] on --

[Cardwell]:      Oh, yeah, other than -- yes.

. . .

[Prosecutor]:    And I -- I can't lead you.  I just want to ask you this question this way.

[Cardwell]:      Uh-huh.

[Prosecutor]:    You may not remember the exact date that [Richter] was murdered.  Okay?

[Cardwell]:      I do remember the date.

[Prosecutor]:    Okay.  Was it June 27th?

[Cardwell]:      28th.

[Prosecutor]:    28th.  Okay.  That was a Saturday.

[Cardwell]:      Yes.

[Prosecutor]:    The Friday before, --

[Cardwell]:      Uh-huh.

[Prosecutor]:    -- which would be June 27th, --

[Cardwell]:      Uh-huh.

[Prosecutor]:    -- did you have any conversations with [Richter] about [Ingerson] that day?

[Cardwell]:      Prior to him coming in, is that what you're --

[Prosecutor]:    Or any time.

17

[Cardwell]: Or any time?

. . .

[Prosecutor]: Well, the day that -- did you see [Ingerson] that Friday?

[Cardwell]: I saw him in the office.

[Prosecutor]: Okay. And that's where I -- I think I was confused and I might have confused you. This episode that you described about [Ingerson] coming in and her calling you over and her making fun of him, did that happen the Friday before she was murdered?

[Cardwell]: The very Friday it happened.

[Prosecutor]: Okay.

[Cardwell]: Uh-huh.

[Prosecutor]: All right. And did you admonish her that same day?

[Cardwell]: I did. I told her not to do that, you know, "Don't lead him on," again. Of course, we laughed. And I told her, you know, "You shouldn't be doing that. If you don't really like him, don't do it."

[Prosecutor]: Did she ever tell you why she was in this relationship if he thought -- she thought he was a -- nerdy and not appealing?

[Cardwell]: She never really said. I -- I think she liked the wine and dine, because he did take her to dinner, and he took her to lunch and a few other things. But --

[Prosecutor]: I'll pass the witness, Your Honor.

THE COURT: All right. [Defense counsel]?

CROSS EXAMINATION

[Defense Counsel]: Was [Ingerson] aware that he was being led on?

18

[Cardwell]: No.

[Defense Counsel]: I don't have any further questions of this witness.

THE COURT: All right. You can step down. Thank you, ma'am.

**State's Witness Calvin S. Story, Jr.:**

Calvin S. Story, Jr. was the twelfth witness. Story testified that he is a forensic scientist. At the time of trial, he said that he was serving his second stint with the Texas Department of Public Safety. Story stated that he has had a lifetime of experience as a forensic scientist and ballistics expert and has previously served in this capacity for DPS and the Austin Police Department. Story averred that after working for DPS for several years, he resigned and then went to work for the Austin Police Department, where he established its first ballistics laboratory. Story said that he worked for twenty years at the Austin Police Department's lab before retiring and then returning to DPS in 1982, where he has worked ever since. Story described his experience as follows:

> In 1974, I completed my degree work at Southwest Texas State University in San Marcos. I was that -- hired that year as a ballistics expert, and I underwent a two-year on-the-job training program by the supervisor at that time. I then started working my own cases under his supervision and -- excuse me -- I joined the Association of Firearms and Tool Mark Examiners, and I've attended annual seminars, training seminars put on by that association. We do continuing education each year, various schools, pub- -- hosted by the FBI and other agencies, and we subscribe to the current periodicals on the subject. And I work in a lab with eight other examiners.[9]

---

[9]At the time of trial, Story had around thirty-seven years' experience in his field.

19

Story described his primary responsibilities at DPS as involving the receiving of fired-firearms evidence and suspect firearms. Specifically, Story said that his duties entailed attempting to determine if two sets of bullets were fired from the same gun or cartridge cases. He also said that he performs serial number restorations and distance determinations, as well as tool mark examinations.

Story described to the jury the parts of the gunning, which consist of the bullet or projectile that goes out the end of the barrel, the cartridge case into which the projectile is fitted against the gunpowder, and the primer at one end of the bullet that ignites the gunpowder when it is struck by a sharp object. He explained that bullets are of different diameters and that the term "caliber" refers to the diameter of the projectile as used in his field. Story explained that the term "grain" refers to a measure of weight, that there are 7,000 grains in a pound, and that the weight of projectiles is stated in grains.

Story also explained that at the time a barrel of a firearm is made, the manufacturer cuts grooves inside the barrel to cause a spiraling of the projectile as it moves through the barrel. He explained that when the projectile moves through the barrel, the projectile is marked by the grooves and lands that are cut inside the barrel and that these markings are referred to as rifling. Story explained that as a ballistics expert, he compares the grooves and lands, along with the twist of the barrel, to identify a particular projectile as having been fired through a particular barrel attached to a particular gun.

Story further said that each gun is built to shoot a particular caliber of bullet. The caliber of bullet to be used with a firearm is printed on the firearm. According to Story, very few guns can fire more than one type of cartridge. Story did, however, identify two caliber bullets that can be fired from the same firearm. Story said that a .357 Magnum caliber bullet and a .38 Special caliber bullet can both be fired by using a firearm that is a .357 Magnum caliber but that a .357 Magnum caliber bullet will not fit and cannot be fired in a .38 caliber gun because a .357 Magnum caliber bullet is too large to fit into a .38 caliber gun.

Specifically to the evidence collected at the crime scene in this case, Story said that because investigators had not recovered any shell casings, it was most likely that the murder weapon was a revolver. Story also said that he tested the projectile recovered at the crime scene and determined that because of its diameter, weight, and "left twist," he believed the projectile had been fired from a .38 Colt or .357 Colt revolver. Story did aver, however, that it would be impossible to eliminate other manufacturers besides Colt. He also averred that there were possibly thousands of Colts that could have fired the projectile recovered from the crime scene.

Story said that he tested the .38 Colt Cobra revolver that Grizzard had sent to him. Story said that he could neither confirm nor eliminate the .38 Colt Cobra as the weapon that had fired the projectile recovered from the crime scene. Story also said that he was unable to match the twenty-two fired projectiles recovered from Indiana to the projectile recovered from the scene. Story further

21

averred that he was certain that "[t]hose 22 bullets were not fired from the same gun" as the projectile recovered from the crime scene.[10]

**State's Witness Mark Wild:**

Witness number thirteen was Mark Wild. Wild said that he is employed by the Texas Department of Public Safety in the Crime Laboratory in Austin. He identified his job as being a latent print examiner. Wild explained that fingers and palms contain ridges and furrows. According to Wild, perspiration from fingers and palms can transfer to surfaces they touch, thereby leaving touched impressions on the surface that are called latent prints. Wild averred that each individual's fingerprint is unique. He said that the pattern left on the surface touched is called a latent print and that the term "latent" means that the fingerprint and palm print patterns are not visible to the naked eye. Wild said that latent prints are lifted from touched surfaces by using various chemical and physical means and that their patterns may be studied and identified.

Wild averred that he went to the crime scene on June 28, 2008, and did a fingerprint and palm print examination of the Envoy vehicle at the scene of the murders. He said that he identified forty-one usable but unidentified prints from the exterior of the vehicle in which the bodies were found and that there were many other unusable prints inside the vehicle.

---

[10]Story wrote four reports that were admitted in evidence as State's Exhibits 56, 57, 58, and 59.

Wild said that Investigators submitted Ingerson's palm prints and fingerprints to him for comparison to the prints he took from the vehicle. Wild wrote in his report that he identified one latent print on the driver's side on the front doorframe as being a match to Ingerson's left palm. Wild also averred that he identified another palm print that was found on the outside of the driver's door as Ingerson's right palm print. Wild testified that other than those of Richter, Ferris, and Ingerson, no other fingerprints or palm prints were identified as to any person who made them from the thirty-one lift cards of prints found on the vehicle. Wild testified that investigators only asked for comparison to Ingerson's prints and those belonging to a James Henry Brown. Specifically, Wild said that he was never asked to compare fingerprints and palm prints to either Mohamed Sylla[11] or David Kelly.[12]

**State's Witness Kelly Nelson:**

Witness number fourteen was Kelly Nelson, who testified that she is a social worker with the Texas Department of Family and Protective Services and

---

[11]Grizzard testified that Sylla was a suspect during the initial investigation. Sylla also testified at trial and his testimony is discussed below. During his time on the stand, Grizzard admitted that Sylla and Richter were suspected of running a fraud scheme at the tax office where she worked, that Sylla and Richter had an intimate relationship, and that he believed Sylla had served time in prison for a conviction of organized criminal activity. Ingerson's fourth point complains of the trial court's exclusion of evidence Ingerson contends is proof that Sylla had a motive to murder Richter.

[12]David Kelly is one of Richter's ex-husbands. Grizzard testified that Kelly was also an initial person of interest. Grizzard admitted that Kelly had been reported to have harassed Richter and on at least one occasion had been reported to have left a knife on Richter's pillow as a threat.

23

that she was assigned to do a home study concerning Richter as a possible placement for a sixteen-year-old named Shakara Love, whom TDFPS considered an "indirect relative" to Richter. According to Nelson, Shakara had previously lived with Richter "off and on for about a year and-a-half to two years." Nelson conducted a home study of Richter's home in Granbury on June 18, 2008. Nelson said that she did not complete her report or make a recommendation due to Richter's death. State's Exhibit 74 was admitted during Nelson's testimony. Nelson said that State's Exhibit 74 was a list of references that Richter gave her concerning Richter's application to be appointed as Shakara's foster parent. One of the names on that list of references was a "Fred McKinney" with a telephone number of "214-325-6178." Nelson testified that she did not contact all of the persons on the reference list because she learned of Richter's death while in the process of making those calls. Nelson presented no direct evidence concerning Ingerson.

**State's Witness Madelyn Victoria Clark:**

The next witness, number fifteen, was Madelyn Victoria Clark, who testified that she goes by Maddy and was twelve years old at the time of her testimony. She said that she is Richter's daughter. Maddy's testimony consisted of identifying a number of photographs—State's Exhibits 85, 88, 91, 92, 95, 96, 97, 98, 99, 100, 101, and 102—and her knowledge of certain people who were in Richter's life around the time of her death. No photograph of Ingerson is contained in these pictures. Maddy said that she was vaguely familiar with

24

Ingerson, remembering that she once went to eat with Richter and Ingerson at a Babe's Chicken House restaurant, that they also went to his house but did not go inside, and that he also came to their home. She presented no direct evidence concerning the charges against Ingerson.

**State's Witness Emily Shay Brewer:**

Emily Shay Brewer was witness number sixteen. She testified that she was eleven years old at the time of her testimony. She said that she is Ferris's daughter. State's Exhibits 81, 82, 83, and 84—pictures of Ferris and Brewer—were admitted with her identification. She testified that she met Ingerson when she went with her mother, along with Richter, to Ingerson's house. By Brewer's account, Richter wanted Ferris to meet Ingerson. Brewer said that she went into Ingerson's house on that occasion and observed him show a gun to Richter and Ferris. She averred that in the weeks before her mom was killed, she went with Richter and Ferris to meet with Ingerson at a restaurant named Pasta Fina. Brewer said that while at the restaurant, Ferris told her that Ingerson was "crazy." Brewer said that she herself thought Ingerson was "creepy."

**State's Witness Shakara Love:**

Witness number seventeen was Shakara Love. Shakara testified that she was nineteen years old at the time of her testimony. Shakara related a history of having lived with various people since she was five years old, when her father became incarcerated. Shakara said that when she was ten years old, she moved in with her cousin, Brent St. Clair, who was common-law married to

Richter. Shakara averred that she lived with them for one year, after which time she stayed with St. Clair when Richter left him. She said that she later lived with St. Clair and his girlfriend for two years. Shakara said that she then lived with a cousin, Crystal Tarver, and that then she was placed in foster care and lived with foster parents, Janine and Victor Franklin, for six years.

By Shakara's account, she lost contact with Richter when Richter moved away from St. Clair. Shakara said that she and Richter came into contact again on October 14, 2007, which was Shakara's birthday. Shakara testified that Richter was planning to adopt her at the time Richter was killed. She averred that she knew about the home study that was conducted.

Shakara testified that Richter was planning to try to make herself look better financially by borrowing money from a man named "Fred"—$10,000 or $15,000 just to put it in her bank account and make it look good—and that Richter then planned to give the money back to "Fred." Shakara was asked if Richter had ever talked about her feelings for "Fred," to which Shakara testified:

> She told me that [he] wanted to be with her and she didn't want to be with him. She said that he disgusted her and that he was bald, and fat, and just -- he -- that was her words, she told me, 'Oooh,' she didn't, that she find him physically attractive or nothing like that."

Shakara proved up photographs depicting her, her brother, and Richter, which were marked as State's Exhibits 78, 79, and 80. She said that she exchanged text messages with Richter on Friday, June 27. Shakara also stated that after Richter's death, she was put in a mental institution for three days.

**State's Witness Tanner Love**:

Witness number eighteen was Tanner Love, who testified that he is Shakara Love's brother. He averred that he was aware that Richter was trying to adopt Shakara. He testified that Richter told him that "Fred" was more of a friend to her than anything else, that she had feelings for another man, and that she and "Fred" were on a "friends basis." Tanner said that he knew the other man she was dating was named Mohamed. Tanner testified that Richter told him that she was going to get money from someone and that some person was going to help her out with the financial part of raising Shakara—he guessed until Shakara moved out—and with the adoption. Tanner gave no testimony about the events of June 27 or 28, 2008.

**State's Witness Jeff Shaffer:**

Witness number nineteen was Jeff Shaffer, who testified that he is a Special Agent for the U.S. Secret Service with twenty-one years of service. Shaffer said that he works investigating telecommunications fraud and digital forensics, and that he was called upon to assist in the telephone investigations concerning the deaths of Richter and Ferris. At the time of trial, Shaffer was working within the "access devices" investigative area with the Secret Service. He explained that his work related to cellphones, credit cards, and anything that accessed a good or service. Shaffer defined his specialty as being in mobile device forensics or cellphone forensics.

Shaffer explained that cellphone records allow him to access a particular cellphone number and then to determine that phone's usage, identifying numbers called as well as numbers calling that particular cellphone. He identified State's Exhibits 104 through 123 as information and pictures taken from Richter's cellphone. He identified State's Exhibits 125 through 136 as items recovered from Ferris's phone records. Shaffer also identified State's Exhibits 137, 138, and 189 as being phone records that showed that the last outgoing phone call made from Richter's cellphone was dialed at 11:52 p.m., eight minutes before midnight, on June 27, 2008. Unanswered incoming phone calls were also identified as having been received but unanswered on Richter's cellphone at 12:23, 12:29, 12:32, and 12:33 a.m. on June 28. Shaffer testified that in his expert opinion, no outgoing phone calls were made on Richter's phone after the phone call went out at 11:52 p.m.[13]

**State's Witness Danielle Donnelly**:

The next witness, number twenty, was Danielle Donnelly, who testified that she was a nineteen-year-old student at Texas Women's University at the time of trial. She stated that she was working as a hostess at Miyako on June 27, 2008. Donnelly said that Richter and Ferris came into the restaurant that night and that she took a photo of them sitting at the bar. She identified State's Exhibits 141

---

[13]The State's theory is that these records establish that the murders occurred at or around 11:53 p.m. on June 27, 2008. The record is strikingly silent as to evidence regarding Ferris, whether her cellphone records established any evidentiary markers, or whether Ferris may have been the primary target. This is so despite the fact that Ferris appears to have been shot first.

28

through 149 as pictures of both the inside and outside of the restaurant and bar as it looked in June 2008. Donnelly identified the bartender working that night as Brandon Krider. She also identified two of the bar workers as being Tom Sawyer and someone that she only knew as "Matthew."

**State's Witness Souligna "Tom" Soupradith:**

Witness number twenty-one was Souligna "Tom" Soupradith. Soupradith said that he works at Miyako as a chef and also works with the owners. He averred that he knew Ingerson as a regular customer. Soupradith said that he was working at the restaurant on Friday, June 27.

According to Soupradith, the people at the bar that night, including Ingerson, Richter, and Ferris, seemed like they were just talking and having a conversation. At one time during the night, Soupradith said that he heard Ingerson say, "F---ing n-g---s." Soupradith said that he responded by looking at Richter and Ferris to see if they were offended but that they did not really pay attention to Ingerson. Soupradith later said that they "just blew him off." Soupradith averred that he did not notice when the two women left, but he did say that Ingerson left with him and the other people in the bar when it closed. Soupradith said that he contacted the people who were in the bar on the night of the murders and requested that they contact the Granbury Police Department to give a statement. On cross-examination, Soupradith stated that he often heard that kind of language in the bar on a daily basis—not from Ingerson but from

other customers. Soupradith said that the fact that this kind of language was used at the bar was not shocking to him.

**State's Witness Thomas Louis Sawyer III:**

Thomas Louis Sawyer III was witness number twenty-two. Sawyer said that he is also known as Trey and was working as a bartender at the restaurant on the night of June 27. He averred that his shift was from 5:00 p.m. to 10:00 p.m. Sawyer said that before he left at about 9:30 or 10:00 p.m., Ingerson came into the bar and met two women who had been waiting for Ingerson.

**State's Witness Brandon Krider:**

Witness number twenty-three was Brandon Krider, who indicated that he was twenty-eight years old at the time of trial and testified that he was working as a bartender at Miyako on June 27, 2008. He said that he noticed two women come in and sit down at the bar at around 9:30 p.m. He described them as "typical guests that came in, jovial, just having a good time." Krider testified that at one point in the evening, he heard Ingerson chastising Richter about controlling her conduct. By Krider's account, one of the other men at the bar said that Richter came over and groped him. Krider said that when he left the bar, Ingerson was standing beside Richter's vehicle.

On cross-examination, Krider testified that either Grizzard or Briley suggested to him that he submit to hypnosis to try to better remember the details of the night of June 27, 2008. Krider said that he declined to do so. He averred that in his prepared statement to the police he wrote that "[Ingerson] could have

30

been the wrong person at the wrong place at the wrong time for all I know, but he was the last person I saw with the ladies. That is as it is." Krider also testified that "there were some roughness in the conversations and hostilities, but that seemed normal sometimes between people . . . It didn't seem enough to be a motive, though." He testified that he did not see anything out of the ordinary that night between Ingerson and the women. Defense counsel questioned Krider:

> [Defense counsel]: Bottom line, Mr. Krider --Krider, that night you didn't really see anything out of the ordinary -- I'm not referring to your statement now -- you didn't see anything out of the ordinary about the interaction between Mr. Ingerson, and these girls or anything like that, did you?

> [Krider]: No sir. I tried to clearly state that.

**State's Witness David Cole Cook:**

Witness number twenty-four was David Cole Cook, who testified that he was a customer at the bar at Miyako on the night of June 27, 2008. Cook identified Daniel or William Buis as another person sitting at the bar that night. The State had put up a photograph of Richter and Ferris that had been previously entered into evidence and questioned Cook:

> [Prosecutor]: And at some point did one of them grab your inner thigh or your crotch area?

> [Cook]: Yes, sir.

> [Prosecutor]: And which of those ladies up there was it?

> [Cook]: The one on the -- closest to me, the one on the right.

31

[Prosecutor]: Okay. And if I represent to you [that] her name is [Richter] and the other one's name is [Ferris], would you disagree with that?

[Cook]: I wouldn't disagree, no, sir.

Cook went on to testify that everyone in the bar got up and left at about 11:45 p.m., and he agreed that the alarms were set and the doors were locked. Cook said that when he left the bar, he went over to a friend's car for a few minutes and then left the parking lot at approximately 11:55 p.m. According to Cook, as he walked by and said goodnight to the two women sitting in the car, Ingerson was standing outside of it. Cook testified that Ingerson never exhibited an angry demeanor. Cook confirmed that it was "all friendly and joking and in good fun and everybody was getting along." He stated that he never saw any anger or bitterness on the part of Ingerson toward anyone. Cook testified that when he left, he shook hands with one or both of the women and with Ingerson. He testified that he did not detect any animosity, anything wrong, or any tension at that time.

**State's Witness Eric Ryan Contreras:**

Witness number twenty-five was Eric Ryan Contreras, who testified that he was the common-law husband of Crystal Tarver and that they knew Richter. Contreras said that Richter left him a message on his phone, asking if she and Maddy could spend the night with him and Tarver so that Richter would not have to drive to Joshua, where Maddy's father lived, and then back to Granbury. Contreras averred that he received this message "after midnight . . . [a]round

32

12:20" on June 28, 2008. Contreras said that he returned the call to Richter immediately upon receiving the message but that she did not answer. Contreras said that he tried to call Richter a second time to no avail. Contreras said that Tarver told him that she had also tried to call Richter.

**State's Witness Crystal Tarver:**

Crystal Tarver, witness number twenty-six, testified that she was Richter's close friend. Tarver said that her brother, St. Clair, was Richter's ex-husband and Maddy's father. Tarver testified that she tried to call Richter "more than once" at approximately 12:30 a.m. on June 28, 2008, but said that she did not receive an answer. Tarver said that she left a voice message but that Richter did not call back. According to Tarver, it was unusual that Richter did not return her call.

**State's Witness Stacy Ann Dooley:**

Witness number twenty-seven was Stacy Ann Dooley. Dooley said that she was living with St. Clair in June 2008. She testified that Maddy was staying with her and St. Clair on June 27. According to Dooley, she spoke with Richter several times on the evening of June 27 because Maddy was upset. She also said that Maddy spoke with Richter during some of these calls. Dooley averred that Richter and St. Clair agreed that Maddy would remain with Dooley and St. Clair for the night because it was late, "probably about 11:45." Dooley said that Richter texted her that night with a message stating, "Please don't let my baby cry." Dooley averred that St. Clair stayed with her that entire night.

33

**State's Witness Marquis Cantu:**

Witness number twenty-eight was Marquis Cantu, who testified that he is a Texas Ranger. He stated that he received an evidence bag, marked State's Exhibit 157 at trial, from Grizzard and took it to the lab in Austin. Cantu said that he filled out a part of a form and listed the contents of the bag as being "khaki shorts." Cantu said that his labeling the contents as "shorts" was a mistake on his part. He testified he did not look in the bag but was told its contents. He averred that some of the writing on the bag, which Cantu attributed to Grizzard, stating that the contents was "[o]ne pair of khaki pants," was correct. In all, Cantu said that he took six separate bags from Grizzard to the crime laboratory.

**State's Witness Mark Dale Reinhardt:**

Witness number twenty-nine was Mark Dale Reinhardt, who testified that he was a Texas Ranger at the time of the investigation. Reinhardt said that he assisted in the early part of this investigation by interviewing witnesses. According to Reinhardt, he and Cantu visited with Doris Kelly, wife of David Kelly. By Reinhardt's account, even though David Kelly, being one of Richter's ex-husbands, was a natural person of interest, he stopped investigating David Kelly after he and Cantu had spoken with the Kellys.

Reinhardt said that he was present during one of the police interviews of Ingerson at the Granbury Police Department on June 29, 2008. He stated that after Ingerson gave his permission to search, he searched Ingerson's vehicle and found State's Exhibit 152, a receipt from Pennzoil Kwik Kar for service done on

34

Ingerson's Mazda Tribute. The receipt was for service on June 28, 2008. Reinhardt said he also received a Crimestopper call about a man named Christopher, who claimed responsibility for the murders of Richter and Ferris. Reinhardt said that he spoke with Christopher and determined he had made up the story of his involvement in the murders because "he wanted to be a big boy around his friends."

**State's Witness Rose "Sissy" Cardwell (Recalled):**

Rose "Sissy" Cardwell was recalled as the next witness. She had previously testified as witness number eleven.

Cardwell testified that she spoke with Richter after Richter came back from having lunch with Ingerson. She said Richter told her that Ingerson gave Richter $10,000 to put into her account or that he put $10,000 into her account. When asked, "What for?," Cardwell said that Richter said that she needed money in her account to show CPS that she was financially stable to take custody of a child. Cardwell said that she knew Richter was wanting Shakara to move in. Cardwell admitted that she never saw the money and did not know for sure that Richter received it from Ingerson or ever put into an account. Cardwell testified that she told Richter that "if she wasn't interested in [Ingerson], to not lead him on, and don't accept dinner invitations or lunch dates or anything from him, because it wasn't fair to lead him on if she didn't have the feelings that he did." She testified that Richter said, "[W]ell, he's funny, he makes me laugh."

On cross-examination, Cardwell averred when confronted with bank records from Richter's bank account, that the records show no $10,000 deposit and that the records show that on June 23, Richter had no money in her account. Cardwell then corrected her testimony to say that Richter told her that Ingerson gave her $10,000 to put into her account but not that Richter ever put the money into the bank account.

**State's Witness Richie Haught:**

Granbury Police Department Detective Richie Haught was the thirtieth witness. Detective Haught said that he assisted in the early stages of the investigation and contacted "Tom," whom he referred to as the manager of Miyako, to get his assistance in getting the people who were at the restaurant on the night of June 27 to meet with Haught at the police department. Haught said that he interviewed the witnesses who showed up. According to Haught, Ingerson did not come to the police department on Saturday, June 28, 2008, at the time when the other witnesses came but that instead, Ingerson showed up at 8:00 p.m. and gave a voluntary interview, a recording of which was admitted as State's Exhibit 165 and played to the jury. Detective Haught identified State's Exhibits 158 through 163 as photographs, taken just days after the murders from a helicopter, showing the scene of the murders and the surrounding neighborhood.

**State's Witness David Cole Thomas:**

Witness number thirty-one was David Cole Thomas, a resident of Johnson County, Texas. Thomas said that he, his wife April, and their children spent the night of June 27, 2008, at the Kellys' home. Thomas testified that David Kelly, one of Richter's ex-husbands, did not leave the home that night. They were also there when the Texas Rangers came to interview David and Doris Kelly on June 28, 2008.

**State's Witness April Thomas:**

Witness number thirty-two was April Thomas, who testified that she is David Cole Thomas's wife. She said that she was also at the Kellys' home on the night of June 27. She testified that she is a very light sleeper and that she did not hear anyone leave the home that night after everyone went to bed.

**State's Witness Saundra Jay Schaad:**

Saundra Jay Schaad, witness number thirty-three, testified that she operated a business in Granbury known as Kwik Kar Lube and Tune. Schaad testified that State's Exhibits 152, 155, and 156 showed that Ingerson brought his automobile to Kwik Kar for service on Saturday, June 28, 2008, at 11:30 a.m. By Schaad's account, Ingerson's vehicle received a full-service oil change including a hood check, a tire check, a fluids check, a window cleaning, and a vacuum of the vehicle. According to Schaad, the exhibits demonstrated that all these services were done by a Kwik Kar employee named Scott Wayman. Schaad stated that Ingerson had mentioned to her when he picked up his car that he had

broken up with a girlfriend over her drinking habits. Schaad said that he thought this was an unusual conversation because Ingerson had never before discussed his relationships. Schaad said that Ingerson's brother, Don Ingerson, also brought his vehicle in for service earlier in the morning on the same day as Ingerson.

**State's Witness Adam Unnasch:**

Witness number thirty-four was Adam Unnasch, who testified that he is a Research Specialist with the Texas Department of Public Safety. He stated that his work involves providing in-depth telephone analysis and that he works with the unit within the Department that is known as the Telecommunications Research Analysis Center. Unnasch testified that he prepared State's Exhibit 167, which he described as a record of the number of outgoing and incoming calls and text messages between two telephone numbers belonging to Ingerson and various other persons in 2008. Exhibit 167 shows 264 total calls and text messages exchanged between Ingerson and Richter from May 8, 2008, to June 27, 2008. The same exhibit shows 355 combined telephone calls and text messages between Ingerson and Lynn Harper during May and June 2008. This witness confirmed that the last outgoing telephone call made on June 27 from Richter's phone began at 11:52 p.m. and that a voicemail message was left. He stated that there were four incoming calls made to Richter's phone on June 28, 2008—one at 12:22 a.m. from Eric Contreras, unanswered; another call from the same number at 12:29 a.m., unanswered; and two phone calls from

Crystal Tarver to Richter—one at 12:32 a.m., unanswered; and one at 12:33 a.m., unanswered but a voicemail message left.

Unnasch testified that no phone calls were answered or returned after 11:52 p.m. on June 27, 2008, on Richter's phone. Unnasch testified that from the map record portion that locates cell towers for cellphone contacts, Ingerson was shown to have made a call on his cellphone at 12:16 a.m. from a cell tower in Granbury, Texas, to Lynn Harper—lasting two minutes.[14] The same map record reflects a second call from a different cell tower—at 12:42 a.m. to Lynn Harper—lasting one minute.

Unnasch also testified that through the cellphone map record, he was able to trace Mohamed Sylla's movement on the night of the murders. According to Unnasch, the map indicated that Sylla had made a call in the vicinity of Marshall, Texas, around 8:00 p.m. Unnasch said that Sylla's calls increasingly got closer to Granbury. The exhibit shows that Sylla made and received a call within Granbury just after 11:16 p.m. Unnasch averred that Sylla made an outgoing call at 11:53 p.m. and received an incoming call at 11:55 p.m. and then did not receive or make another call until nearly 2:30 a.m. on Saturday. Unnasch said that Sylla's movements from there could be traced through his cellphone usage

---

[14].Ingerson stated in one of his voluntary recorded statements at the Granbury Police Department that after he left the restaurant on Friday night, June 27, 2008, he went to his home and then left from there to go to Lynn Harper's residence, where he spent the night with her.

and that the movement displayed that he had driven from Granbury to Dallas/Fort Worth International Airport.

**State's Witness Mohamed Sylla:**

Mohamed Sylla was witness number thirty-five. He testified at trial that he was a thirty-three-year-old African-American who was born in Ottowa, Canada, and lived in an apartment in Granbury at the time of the murders. He stated that he had been convicted of the crime of organized criminal activity in Texas and was sentenced to eight years in a Texas penitentiary, of which he served two years. Sylla said that he met Richter at the tax office when he came there with his coworker, who was buying license plates. He testified that he got Richter's telephone number the first time that he met her, that he later called her to go out on a date, and that their relationship ultimately became a sexual one. Sylla said that he met Richter in early 2008 and that he was in contact with her by phone on the night of her murder.

According to Sylla, he had been out of town on June 27 for work and was driving back to his apartment from Louisiana. Sylla said that while he was out of town, two female friends who were in their early 20s—Casey Turner and Kristina Scott—were at his apartment. Sylla stated that he had left a key with Turner so that the two women could decorate his apartment. By Sylla's account, he had an intimate relationship with Turner, but Scott was merely a mutual friend of his and Turner's. Sylla said that he called Turner when he got to Fort Worth from Louisiana to tell her that he was on his way.

40

Initially, Sylla averred that Richter did not know that he would be back in Granbury and that he had not received any text or voice messages from her that day. But when shown text messages that had come from his phone to Richter's, Sylla said that he would not dispute that the texts were from him and that the two had communicated by text that day. Sylla averred, however, that he never indicated to Richter that he would be back in town and that he had specifically contacted Turner, who he said he was more interested in contacting. By Sylla's account, he preferred Turner's romantic liaisons over those of Richter. And, according to Sylla, Richter's romantic interest in him exceeded his romantic interest in her.

Sylla said that he got back to his apartment between 11:00 and 11:30 p.m. He averred that he then visited with Turner and Scott, rested awhile, and packed for a trip he was making to Virginia leaving from DFW Airport that morning. He said he was going to visit his aunt and his sister. Sylla said that he left his apartment between 2:00 and 2:30 a.m.

Sylla said that while in Virginia, Briley called him on Saturday, June 28, and asked that he go to the nearest police station for an interview, which he did. Sylla stated that it wasn't until his drive to the Virginia police station that he was informed that Richter had been murdered. Despite learning this, Sylla said that he attempted to call Richter.

Sylla said that he later spoke with Grizzard and Briley when he returned from his Virginia visit. Sylla also said that he was scared because there was talk

41

in the community that there "may have been something racial going on that caused [Richter] to lose her life." Sylla said that he was concerned that he was a suspect.

On cross-examination, Sylla elaborated on his previous conviction. He said that he was paroled after two years and was still on parole in June 2008.

Sylla averred that the vehicle he drove to the airport was a sand-colored Cadillac Escalade, a vehicle he had purchased a few weeks prior to the murders. Sylla initially stated that he owned the Escalade for "[p]robably a year." He admitted later that, roughly five months after he purchased it, he had placed the Escalade on consignment with the dealership that he had bought it from.

Sylla also changed his story multiple times about when and who told him about Richter's murder. At times in his testimony, he averred that Briley had informed him when Briley called him in Virginia. At other times, Richter averred that a coworker called him as he drove to the Virginia police station and informed him that Richter had been murdered. Sylla also changed his story multiple times regarding who had called him first, Briley or his coworker. Ultimately, Sylla said he could not remember who called him first and simply stated that he was "standing by [his] testimony." Sylla was equally confused as to what either caller had told him. At one point Sylla seemed to have said that he had deduced that Richter had been murdered because Briley had told him something bad had happened to Richter and his coworker had reported seeing a coroner's vehicle near Richter's vehicle on Saturday morning. But then Sylla said that he may

have learned about Richter's murder from this coworker, who learned about the murder on the Internet.

**State's Witness Casey Turner:**

Witness number thirty-six was Casey Turner, who testified that she was twenty-four at the time of trial. Turner said that she met Sylla while he was a customer at a UPS store where she and Scott worked. Turner testified that she and Scott had been decorating Sylla's apartment while he was out of town. According to Turner, Sylla got to his apartment on June 27, 2008, between 11:10 and 11:15 p.m. and then he left between 2:00 and 2:30 a.m. to go to the airport for a trip. Turner said that Sylla's flight was "really early in the morning [for him] to go to a job." Turner also said that Sylla did not take a bag with him to the airport. She testified that even though she had gone out to eat with Sylla on occasion, she repeatedly denied that the two had ever been sexually intimate.[15] She also denied that the reason Sylla drove home before flying out was specifically to see her. Turner said that she did not know Richter or Ingerson.

**State's Witness Kristina Scott:**

Kristina Scott, witness number thirty-seven, testified that she was twenty-one years old at the time of trial. She stated that she and Turner were at Sylla's apartment, waiting for him to return from Louisiana on Friday, June 27, 2008.

---

[15]Sylla testified that he and Turner were intimate, and that he was more interested in spending time with Turner than he was with Richter. When Turner was asked specifically about Sylla's testimony that the two had had at least one sexual encounter, Turner replied, "That, no."

She averred that Sylla arrived later in the evening and left "sometime after 2" to catch a flight to go visit "family." Specifically about Sylla leaving that morning, Scott said that she "wasn't alert" and that she "remember[ed] kind of waking up a little bit because of [Sylla] opening the door and stuff." Scott said that she did not know Richter or Ingerson.

**State's Witness James Marlowe:**

James Marlowe was witness number thirty-eight. Marlowe testified that he is the owner of Comet Dry Cleaners and knew Ingerson, and said that Ingerson had dropped off a pair of pants to be cleaned at 11:59 a.m. on Saturday, June 28. State's Exhibit 176 is a copy of the dry cleaner receipt identified by Marlowe. Marlowe said that Ingerson had been a customer for several years and that it would not be unusual for him to drop off clothes to be cleaned on a Saturday or any other day. According to Marlowe, the procedure at the cleaners was for the clothes to be placed on a counter when dropped off, then placed in a bag. Marlowe said that the bags are not laundered or sanitized between different sets so that the clothes are dropped out of the bags, sorted for cleaning, and then placed into appropriate buggies with everybody else's clothes needing that type of processing. Marlowe averred that the buggies contained many items of clothing from different customers.

Marlowe said that he was mowing a field on his tractor on Sunday, June 29, when he received a call from the police department asking him to come to his Granbury store so that they could pick up some clothing. Marlowe said

that he contacted his daughter, Chandra Ehardt, who went with him to the store to get the clothing. According to Marlowe, he had customers who were police officers, Sheriff's deputies, DPS officers, and former Texas Rangers. Marlowe said that he believed that many of his customers owned and regularly fired guns. He testified that on Sunday night, the police took the pants Ingerson had dropped off for cleaning on Saturday, June 28, 2008.

**State's Witness Chandra Ehardt:**

Witness number thirty-nine was Chandra Ehardt. She said that she went to the dry cleaners with her father, Marlowe, to meet the police and deliver to them the clothes they wanted to pick up. She confirmed the process of how the clothes are checked in, put in bags, pushed over the marking counter, sorted by different methods of processing, and dumped into buggies for cleaning. Ehardt testified that the police officer picked up one shirt and one pair of pants. She confirmed that Ingerson's clothes were mixed other customers' clothing items that were placed together in the bags and in the buggy.

**State's Witness Phillip Stout:**

Phillip Stout, witness number forty, testified that he worked for the Texas Department of Public Safety crime laboratory in the Trace Evidence Section. Stout said that he analyzes glass, paint, hairs, fibers, unknown substances, and various materials. Stout explained how gunshot residue containing the compounds lead, barium, and antimony are contained within the gas that is ejected from a gun when it is shot. He also explained how these three

45

substances in molten form result from the explosion of the gunpowder and sling the bullet out of the gun. He explained how the stubs and the particles on them are ranked with all three components being a finding of "characteristic" and that if only two of the components are found, it is a finding of "indicative." Stout said that these particles can be collected on what he called stubs[16] and then analyzed.

In this case, Stout said that he did gunshot-primer-residue testing on Ingerson's pants and from under the driver's seat in the Ingerson vehicle. From the stubs taken off Ingerson's pants, Stout averred that one sample of it had all three components and three others had only two components. Concerning the samples from under the front of the driver's seat, Stout said that he found only one particle that was a "[t]wo-component particle." He testified that the particles can collect on a gun when it is fired and then rub off on items such as clothing and underneath a car seat that might come in contact with the gun. Stout said that particles can remain on clothing, can be transferred from one piece of clothing to another by contact, and that this type of transfer can occur in a dry cleaning environment. He said that residue particles can exist for an indefinite period of time and, accordingly, it could not be determined when the particles were gathered on the pants and under the car seat. Stout also said that in addition to firing a gun, there are other situations that can lead to the same types

[16]A photograph of a stub is shown in State's Exhibit 53.

of residue as found on Ingerson's pants, including: brake pads, automobile electricians, car radio installers, and furniture finishers.

**State's Witness Scott Wayman:**

Scott Wayman, witness number forty-one, testified that he was twenty-four at the time of trial and that he had worked at the Kwik Kar in Granbury on June 28, 2008, when Ingerson brought his Mazda vehicle in for service. Wayman said that as he was vacuuming Ingerson's vehicle, he noticed a gun under the driver's seat. By Wayman's account, he didn't think it was unusual for a customer to have a firearm under the front seat. Wayman said that later, "Ranger Danny" called and asked if he had seen anything unusual about Ingerson's vehicle when it was serviced. Wayman said that he mentioned seeing a gun. Wayman made a statement in August 2008 to Briley describing the gun as a revolver with a hammer. At Briley's request, he drew a picture of the gun, which was admitted as State's Exhibit 172, and that he drew a hammer on that gun. He also identified a picture of a revolver with a hammer like what he saw, which was admitted as State's Exhibit 170.

Wayman testified that he could only see a part of the gun because it was in a holster. He described the barrel as being pointed towards the rear of the vehicle and as laying under the driver's seat, not fully exposed to easy view. Wayman said that his statement specifically was, "it had an S and W stamped on the grip." Wayman also said that he clearly identified the gun as having a

47

hammer: "I could see the hammer." It is in evidence that Wayman drew a hammer on the drawing admitted as State's Exhibit 172.

Later, in April of 2009, Briley again contacted Wayman. Wayman said that Briley visited with him at a Whataburger about his statement and then Briley and another Granbury detective took him to Cabela's to look at guns. Wayman said that at Cabela's, Wayman picked out a revolver that he said he thought looked like the gun he had seen on June 28, 2008. Exhibits 173, 174, and 175 are photographs of the guns he picked out at Cabela's, which Briley later identified as being Colt hammerless revolvers. Despite Wayman having picked out a Colt at Cabela's, he insisted at trial that the gun he saw in Ingerson's car was a Smith & Wesson.

**State's Witness Melinda Russell:**

Melinda Russell was witness number forty-two. Russell testified that she lives in South Texas and was thirty-four years old at the time of trial. She said that in 2007, she had a four-month relationship with Ingerson that became intimate at some point. She testified that in December 2007, Ingerson showed her a silver revolver that he had stored in the cargo area of his car. Russell also said that Ingerson was at the Heat Wave car show in March 2008.

**State's Witness Mary Michelle Schroeder:**

Mary Michelle Schroeder was witness number forty-three. She testified that she met Ingerson through her late husband, Craig, who was one of Ingerson's best friends, and she said that the two men had been friends for

48

probably twenty-five years. She averred that she and her husband attended the Fourth of July parade in Granbury with Ingerson and his girlfriend, Lynn. Schroeder testified as to one conversation that she had with Ingerson when the subject of Ingerson's being at the restaurant on the night of the murders came up. She averred that Ingerson did not act like his being there was any big deal and that he conveyed the attitude that he just happened to be one of the other people there.

**State's Witness Michael Propst:**

Michael Propst, witness number forty-four, testified that he had known Ingerson since high school, so for over thirty years. By Probst account, he lost track of Ingerson when Ingerson moved to Indiana, but he said that they reconnected around 2008. He indicated that he began to meet with Ingerson periodically and talk with him on the phone. Propst said that he had a conversation with Ingerson about the fact that Ingerson had a dinner date with Richter. He said he later asked Ingerson about whatever happened between him and the girl in Granbury. He said that Ingerson's response was to hang his head and say, "I won't be seeing her anymore." Propst testified that sometime between the end of June and early July of 2006, he saw a handgun case in Ingerson's vehicle that Ingerson said contained "a .38." Propst averred, however, that he never actually saw the gun.

**State's Witness Lynn Ann Harper:**

The next witness, number forty-five, was Lynn Ann Harper. Harper testified that she had been dating Ingerson for a little more than two years, beginning in January 2008. She said that her relationship with Ingerson was physically intimate. Harper said that she talked with Ingerson several times on Friday, June 27. By Harper's account, Ingerson told her that he was going to do some work in his office at his house, go to grab a bite to eat, and would talk with her later about plans for the weekend. She said that he next called her at 12:15 a.m. and asked if he could come over, to which she replied yes. According to Harper, Ingerson came to her place in Arlington about 1:30 a.m. on June 28. Harper said that Ingerson acted normal and did not seem anxious, agitated, or upset. After they woke up, Harper said that Ingerson left her house to go to a car show at LaGrave Field and then he came back to her house at a late lunch time. She said he then got a call and left to go back to Granbury that evening.

**State's Witness Danny Briley:**

Witness number forty-six was Danny Briley, who testified that he is a Texas Ranger. Briley was involved in this murder investigation from the time the bodies were discovered on the morning of June 28, 2008, having arrived at the crime scene around 10 a.m. Briley averred that he located Richter's cellphone on the floorboard of the vehicle between the driver's legs and immediately attempted to determine who had been called from the phone and had made calls to the phone.

50

Briley located persons he was interested in speaking with from the cellphone's records. He said that he proceeded to contact many of the people who were on the cellphone's records and had other investigators contact other people that he did not talk to initially. By Briley's account, he contacted Ingerson by telephone and asked him to come to Granbury for a meeting. Briley said that Ingerson came to Granbury and went to the police department, where Ingerson gave his first voluntary statement to Detective Richie Haught. Briley, who had not been at that first interview, then interviewed Ingerson at around 3:30 p.m. at the Granbury Police Department. Ingerson maintained his innocence and answered all of the questions.

During that interview, according to Briley, Ingerson was confused about what time the bar closed. Briley said that Ingerson thought it closed at 11:00 p.m., when it in fact closed at midnight. Briley said that Ingerson's testimony was consistent with statements from other witnesses about the bar closing and people leaving. According to Briley, Ingerson insisted that he spoke with the two girls while the girls sat in Richter's car with the windows down. He also admitted he was the last person to leave the parking lot that night except for the two women still sitting in the car parked in the parking lot. Briley averred that he coordinated Hutson's visit to Sharon Hutcheson, Ingerson's ex-wife in Indiana, when Hutson picked up the .38 caliber jacketed bullets that went with the .38 caliber gun Hutcheson had said she gave back to Ingerson.

51

Briley said that he handled the contact with the Kwik Kar personnel and the interview with Wayman. Briley stated that Wayman had identified the gun he saw as a Smith & Wesson and that he put that in Wayman's typed, sworn statement because that was what Wayman had said. Briley testified that Wayman drew the picture of the revolver shown in State's Exhibit 172 in his presence. Briley testified that he asked Ingerson about the .38 caliber Colt Detective Special that Ingerson's ex-wife in Indiana had said she had given back to Ingerson and that Ingerson told Briley that he had last possessed the gun, which he called a silver revolver, six months before the interview with Briley.

Briley testified that Ingerson told him that he sold the .38 to a Mexican in South Texas. Ingerson's statement would have put the date of sale at either December 2007 or January 2008. Briley participated in all three of the videotaped interviews of Ingerson that are marked State's Exhibits 154, 165, and 198, all of which were played to the jury in open court. Briley admitted that he spoke with Elrod, Stonebraker, and Mathew—all of whom were from Indiana—about the .38-caliber Colt bobbed-hammer pistol. Briley said that he was the investigator who dug up the twenty-two bullets[17] fired from the .38-caliber Colt bobbed-hammer pistol that Ingerson once owned. Story's report, Exhibit 59, shows that Grizzard submitted these bullets to Story at the DPS lab for analysis.

---

[17]Story's report concluded that the bullet found at the crime scene was not fired from the same gun as these twenty-two bullets dug up in Indiana. When he was on the stand, Story testified to his conclusion that the bullet found at the crime scene had not been fired from the same gun that fired the twenty-two bullets recovered in Indiana.

52

During Briley's testimony on cross, this colloquy transpired:

[Defense Attorney]: Okay. And let me just ask you to please tell the jury what evidence was recovered from the victim's vehicle or the -- or the crime scene other than Mr. Ingerson's fingerprints or item 11, the bullet, that connect him in any way to this murder.

[Briley]: Well, that's not just the only thing to connect him to this murder.

[Defense Attorney]: My question was, what DNA, hair, blood, bullets, I mean other than his fingerprints -- and I understand that your theory of this case is that that bullet came from a murder weapon, but the fact of the matter is there's no ballistics and there's no murder weapon in this case. Is that true?

[Briley]: We have not recovered a murder weapon in this case.

[Defense Attorney]: And there's no any kind of forensic or ballistic report that connects item Number 11, the bullet with Shawna Ferris' DNA on it, to any gun ever owned by [Ingerson].

[Briley]: There's no direct evidence.

[Defense Attorney]: Okay. So back to my original question. What did you recover out of the vehicle -- or the DPS -- you didn't do it, the DPS crime unit did it. Are they competent?

[Briley]: Are they -- is the DPS crime scene competent? Yes.

[Defense Attorney]: And the labs who do the analyses, are they competent?

[Briley]: Yes.

[Defense Attorney]: In your opinion?

[Briley]: Yes.

53

[Defense Attorney]: And they went over the vehicle, did they not?

[Briley]: Yes.

[Defense Attorney]: It -- the crime scene was roped off, and y'all didn't contaminate it. You've already testified to that.

[Briley]: Correct.

[Defense Counsel]: And they got there and they were there several hours, were they not?

[Briley]: Correct.

[Defense Counsel]: And you've identified blood splatter and blowback and things like that in your documenting the scene.

[Briley]: Yes.

[Defense Counsel]: That's all fair to say.

[Briley]: Yes, sir.

[Defense Attorney]: And what hair or fiber or DNA of [Ingerson] or any other biological evidence was found at the crime scene or in the vehicle that you were talking about, this science stuff?

[Briley]: About that vehicle, none.

[Defense Attorney]: Okay. What about the entire crime scene?

[Briley]: Entire crime scene, none other than you've mentioned.

[Defense Attorney]: The fingerprints?

[Briley]: Correct.

[Defense Attorney]: And were his shoes and clothes and the stuff that he turned over in his vehicle, were those checked for blood, checked for biological

54

evidence, checked for hairs of the victims, checked for fibers, that sort of stuff?

[Briley]: The clothes that he submitted were checked for those sort of things, yes.

[Defense Attorney]: Okay. And were there any biological -- any DNA, any hair, any fibers recovered?

[Briley]: There was some hair and fibers recovered, but none to Ingerson.

[Defense Attorney]: Okay. And, in fact, the fingerprints, we talked about this earlier, and I don't know if you were -- were here for any of that testimony, I don't think you were, but you're aware that there were many other unidentified prints on the vehicle.

[Briley]: Yes, I am.

[Defense Attorney]: So the -- blowback blood that you identified on the dash of the vehicle, none of that was found on any of -- of Mr. Ingerson's clothes.

[Briley]: None of the clothes that he submitted --

[Defense Attorney]: What --

[Briley]: -- that they found.

[Defense Attorney]: None on the pants, not on the shirts, not on the shoes.

[Briley]: None.

On cross-examination, Briley admitted that there was no DNA, hair, blood, or bullets that constituted forensic evidence connecting Ingerson to the murders. Briley likewise admitted that there was no kind of forensic or ballistic report that connects item 11, the bullet with Ferris's DNA on it found at the murder scene, to

55

any gun ever owned by Ingerson. There is no direct evidence at all connecting Ingerson to the murders.

**Defense Witness Ronald Thomas Fazio:**

The first witness for the defense was Ronald Thomas Fazio. Fazio testified that he is the Laboratory Director and one of the senior forensic scientists for Integrated Forensic Laboratories. Fazio testified that he is an expert in the field of forensic science and criminal forensic laboratories.

Fazio said that he had reviewed Story's reports regarding Story's analysis and interpretation of bullets and firearms submitted for examination. Fazio agreed with Story's conclusions stated in the reports; however, he was highly critical of Stout's January 6, 2011 gunshot residue report because while Fazio said he agreed with the procedures identified by Stout concerning the collection of particles, Fazio stated that gunshot residue analysis is a terrible forensic tool, averring that gunshot residue particles that may be found are tiny metal balls that do not evaporate, do not decompose, and can remain on surfaces for years.[18] He stated that it would be no surprise to find certain residue particles on the belongings of any person who owns firearms. Furthermore, Fazio testified that if hard evidence collected from clothing has been in contact with other material or potential evidence, then it could not be ruled out that the gunshot residue may

---

[18]Stout himself testified that there was no way to determine how long residue had been on the pants and interior of Ingerson's car. Stout also testified that the type of residue collected could have originated from multiple non-firearm-related scenarios.

have been transferred from other clothing not collected or tested. He indicated that at his testing center, gunshot residue testing was not performed because it is not a very good forensic tool. He further said that some research shows fireworks, brake pads, and other environmental contamination can show gunshot residue-like particles. He said that gunshot residue examiners generally put very little weight to a two-component particle and that the top tier is the three-component particle.

## Defense Witness Sonny Frisbie:

Defense witness number two was Sonny Frisbie. He stated that he is employed as an investigator with the Hood County Sheriff's Office. He testified that Richter was a walk-in complainant when she came to the sheriff's office on September 10, 2007, wanting to make a complaint. He said that she came in to file a terroristic threat report. He was unable to give details on how the complaint was handled by the sheriff's office.

## Defense Witness C. R. Feazell:

Defense witness number three was C. R. Feazell. He testified that he owns property in Tolar, Texas, which contains a pond. He testified that Ingerson would call him from time to time, requesting permission to go to that pond to shoot firearms. He also stated that when Ingerson came to Feazell's property, he loaned Ingerson his pickup truck. Feazell said that he often carried firearms in his pickup truck because, as a quail hunter, he does a lot of shotgun shooting. He said that he is a longtime friend of Ingerson's father.

**Defense Witness Steven Gomez:**

Steven Gomez was defense witness number four, who testified that he was in Granbury at a business known as RC's Bar on the night of June 27, 2008. Gomez averred that he stayed at the bar until it closed at about midnight and then left with a friend, Joseph Morvan. By Gomez's account, he and Morvan drove to a Jack-in-the-Box, arriving at about 12:15 a.m. on Saturday, June 28. Gomez said that they obtained food in about ten minutes, taking the time to 12:20 to 12:25 a.m. Gomez said that they then stopped to eat their food right behind the Jack-in-the-Box at his mom's house, somewhere between 200 and 300 yards from Miyako. According to Gomez, he and Morvan had eaten their food and were talking while sitting on the tailgate of their vehicle when they heard two gunshots. Gomez said that the time of the gunshots was between 1:00 and 1:30 a.m. He testified that the gunshots came from the restaurant area. While Gomez conceded that the sounds he heard could have been made by fireworks, he averred that it "[s]ound[ed] like gunshots to me."

**Defense Witness Joseph Morvan:**

Joseph Morvan was defense witness number five. Morvan confirmed that he and Gomez had bought their food and were sitting within 200 to 250 yards of Miyako when they heard what they believed were gunshots at around 1:00 a.m. He testified he was eighty percent sure that the noises he heard were gunshots.

58

**Defense Witness Ronnie Curry:**

The defense called its final witness, Ronnie Curry, defense witness number six. Curry said that he works as a security guard at Comanche Peak Nuclear Power Plant. He testified that his home is in Granbury, right off of State Highway 144. Curry said that on his way home, he routinely drives by the Bear's Plumbing business that is next to Miyako. He testified that when he drove by the Miyako and Bear's Plumbing parking area at approximately 12:05 to 12:20 a.m. on June 28, 2008, he noticed an SUV-type light-colored vehicle that was parked under the big floodlight in the parking area. When he learned of the murders, he said he contacted the Granbury Police Department and gave a statement about observing the parked vehicle.

**Rebuttal Witnesses:**

The State called four rebuttal witnesses. Three testified to hearing fireworks or gunshots a couple of hours earlier on the evening of June 27 but not around midnight. The fourth witness was the detective that Ronnie Curry gave his statement to about having seen a light-colored SUV.

**End of Testimony:**

Both the State and the defense closed without calling any other witnesses.

## IV. DISCUSSION

Ingerson was charged with Capital Murder by an indictment dated March 3, 2010. The indictment alleged in part as follows:

> . . . that on or about the 27th day of June, 2008, . . . in Hood County, Texas, FRED EARL INGERSON, III, Defendant, did then and there

59

intentionally or knowingly cause the death of an individual, Robyn Richter, by shooting Robyn Richter with a firearm, and did then and there intentionally cause the death of an individual, Shawna Ferris, by shooting Shawna Ferris with a firearm, and both murders were committed during the same criminal transaction.

Ingerson was convicted by a jury of capital murder and sentenced by the court to life imprisonment without parole.

Ingerson duly perfected appeal to this court and asserted as his first point: "THE EVIDENCE PRESENTED AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT THE VERDICT OF GUILT; NO RATIONAL TRIER OF FACT COULD HAVE DETERMINED THE ELEMENT OF IDENTITY BEYOND A REASONABLE DOUBT."

Justice Meyers has stated as follows:

In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979*)*; *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006*)*; *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004*)*. The reviewing court must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 318–19, 99 S. Ct. 2781. In reviewing the sufficiency of the evidence, we should look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993) ("[i]t is not necessary that every fact point directly and independently to the

60

defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances."); *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara*, 152 S.W.3d at 49. On appeal, the same standard of review is used for both circumstantial and direct evidence cases. *Id.*

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In *Jackson v. Virginia*, Justice Stewart provides further guidance:

After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS*, 385 U.S., at 282, 87 S. Ct. at 486 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana*, 406 U.S., at 362, 92 S. Ct. at 1624–1625. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89, *cert. denied*, 444 U.S. 890 (1979) (footnote omitted).

In *Hooper v. State*, the court further states:

Under the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. To correctly apply the *Jackson* standard, it is vital that courts of appeals understand the difference between a reasonable inference supported by the evidence at trial, speculation, and a presumption. A presumption is a legal inference

61

that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. S*ee* TEX. PENAL CODE § 2.05. For example, the Penal Code states that a person who purchases or receives a used or secondhand motor vehicle is presumed to know on receipt that the vehicle has been previously stolen, if certain basic facts are established regarding his conduct after receiving the vehicle. TEX. PENAL CODE § 31.03(c)(7). A jury may find that the element of the offense sought to be presumed exists, but it is not bound to find so. TEX. PENAL CODE § 2.05. In contrast, an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

As stated above, juries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation.

*Hooper v. State*, 214 S.W.3d at 15–16 (footnote omitted).

The State's burden here was to prove beyond a reasonable doubt that Ingerson did intentionally or knowingly cause the death of, first, an individual named Robyn Richter by shooting her with a firearm and, second, did also intentionally or knowingly cause the death of a second individual named Shawna Ferris by shooting her with a firearm.

The State urges eight items of evidence that it contends establish guilt beyond a reasonable doubt in this circumstantial evidence case. Those items are:

(1) Ingerson's relationship with Richter,

(2) Ingerson's alleged motive to murder the victims because of Richter's disingenuous feelings towards him,

(3) Ingerson's presence at the location and time of the victims' murders,

(4) Ingerson's ownership of a gun of the same make and caliber as the murder weapon,

(5) the presence of the gun under the driver's seat in Ingerson's vehicle the day after the murders,

(6) the presence of gunshot residue under the driver's seat of Ingerson's car and on the pants Ingerson wore the night of the murders,

(7) Ingerson's alleged suspicious activity following the murders, and

(8) Ingerson's incriminating statements to police and others.

The State contends it proved that Ingerson was romantically interested in Richter but that Richter was using Ingerson's feelings for her own financial gain. Evidence was presented that Richter made fun of Ingerson behind his back. However, there is no evidence that Richter's mocking or belittling conduct was done to Ingerson's face or that he was aware of this conduct. Indeed, Cardwell is the person who testified to Richter's alleged belittling, and she averred that Ingerson was wholly unaware of it. Some evidence described what may be called flirty activity on Richter's part at the bar—she allegedly grabbed the inner thigh or crotch area of one of the men sitting at the bar. But even after that action, when the bar closed and the patrons left all in a group, Ingerson was described as friendly while speaking to Richter and Ferris while the two women were sitting in Richter's car parked outside the bar. The women had left the bar approximately an hour and a half before closing time, but they had returned and did not come back inside but rather sat in their car. David Cook, one of the

63

people at the bar, had parked his car near where the women were parked and, upon exiting the bar, had a brief conversation with one of the other men who were leaving. Cook then came back by Richter's car, spoke with each of the women, shook hands with one or both of them and with Ingerson, got in his car, and left just a few minutes after the bar closed at midnight. Cook described the attitude of the two women and Ingerson at the time as friendly. All of the other people left the bar parking area except for Ingerson, who was last seen by Cook, the last to leave, standing quietly outside the women's car conversing with them. No one described Ingerson as angry or in any way moved to violent conduct while standing outside Richter's car talking with the women. Not one of the witnesses called by the State presented evidence of any angry exchange of words or conduct between Ingerson and Richter. No evidence supports the State's contention that Ingerson was driven to murder because he was offended by Richter's conduct towards him.

The telephone records established that within the last two months before June 27, 2008, Ingerson and Richter exchanged 264 telephone calls and text messages. There is no evidence that any of those contacts involved anything other than a friendly and non-adversarial relationship between Ingerson and Richter. Sissy Cardwell, Richter's coworker, testified that she was aware that Richter was attempting to obtain money from Ingerson. Richter wanted $10,000 to put in her bank account, attempting to show that she could afford to have custody of Shakara Love, a sixteen-year-old friend. Richter had applied for

64

custody of Shakara, and her application was being investigated by a state agency. The State subpoenaed Richter's bank records, which reflected that no large deposit—no $10,000 nor any other amount in excess of a few hundred dollars——was ever deposited into her bank account in the months prior to June 27, 2008. Ingerson described his relationship with Richter by stating, "We agreed that we were just going to be friends." Shakara's brother, Tanner Love, testified that Richter told him she and Ingerson were just on a "friends basis." Ingerson constantly maintained in his voluntary statements made to the law enforcement officers that he was merely in a friendly relationship with Richter and that they were not intimately involved in any way.

The State's first two items of evidence that it claims support the verdict are mere speculation and not grounded in admitted evidence. The State's third contention is that Ingerson's presence outside the bar and being the last person seen with Richter and Ferris is evidence of his guilt. "Mere presence of a person at the scene of a crime either before, during[,] or after the offense, or even flight from the scene, without more, is insufficient to sustain a conviction as a party to the offense." *See Siros v. State*, No. 01-14-00288-CR, 2015 WL 3981774, at *4 (Tex. App.—Houston [1st Dist.] June 30, 2015, pet. ref'd) (mem. op., not designated for publication); *Garcia v. State*, 486 S.W.3d 602, 612 (Tex. App.—San Antonio 2015, pet. ref'd); *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985), *accord Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). *See also Ellis v. State*, 551 S.W.2d 407, 412 (Tex. Crim. App. 1977);

65

*McBride v. State*, 486 S.W.2d 318, 319–2- (Tex. Crim. App. 1972); *McCormick v. State*, 168 Tex. Crim. 489, 329 S.W.2d 436, 437 (1959); *Burleson v. State*, 132 Tex. Crim. 2, 3, 101 S.W.2d 1020, 1024 (1936); *Gillard v. State*, 128 Tex. Crim. 514, 516, 82 S.W.2d 678, 679 (1935); *Anderson v. State*, 85 Tex. Crim. 411, 413–14, 213 S.W. 639, 640 (1919).

The State urges in its items of evidence (4) and (5) Ingerson's previous ownership of a .38 Colt bobbed-hammer pistol because it was a gun that could have fired the .38-caliber bullet found in the back seat of the Richter's vehicle in which the women were found murdered. That bullet was depicted in State's Exhibits 33, 34, 35, and 36 as it was found inside the Envoy on the morning after June 27, 2008.

The bullet was delivered to Calvin S. Story Jr., a forensic scientist working at the Firearms Section of the Texas Department of Public Safety Crime Laboratory, for analysis. His report is admitted as State's Exhibit 56 and states his conclusion regarding the fired bullet—identified in his report as item 11—the same as the bullet depicted in the above-referenced pictures: "It is our opinion that this bullet, item 11, was fired from a firearm capable of chambering and firing a .38 Special, .357 Magnum, or .38 Super (Auto) caliber cartridge. A list of possible firearms would include, but not be limited to, .38 Special and .357 Magnum Colt revolvers and .38 Super (Auto) pistols.

No evidence being found that Ingerson possessed or had access to a .357 Magnum pistol or a .38 Super (Auto) pistol, those two categories of pistol types

66

that might have fired the projectile found in the back of the Envoy vehicle were not discussed by the State's witnesses. Instead, the focus of attempting to identify the "murder weapon" turned to the Colt .38 Special bobbed-hammer pistol Ingerson purchased from James Elrod on February 12, 1999.

The State's summary item (4) reads "(4) [Ingerson's] ownership of a gun of the same make and caliber as the murder weapon." The State's summary item (5) reads "the presence of the gun under the driver's seat in [Ingerson's] vehicle the day after the murders." The gun Ingerson purchased from Elrod was one of the three categories of pistols that might have fired the projectile bullet found in the back of the Envoy vehicle. The evidence at trial was that Ingerson stated that he had sold this pistol "to a Mexican in South Texas" sometime before June 27, 2008. No witness or evidence proved any recent possession of that pistol by Ingerson. The inference is that because Ingerson once owned a type of pistol that might have fired the projectile, he possessed the murder weapon. Briley and Grizzard learned from Elrod's testimony that he had fired the .38 bobbed-hammer pistol into a dirt berm while doing target practice. Briley and Grizzard traveled to Indiana and dug many projectiles from the dirt berm. They found twenty-two projectiles that were .38 caliber. Those twenty-two projectiles were submitted to the Texas Department of Public Safety crime lab and were examined by forensic expert Story. Story's testimony about those twenty-two projectiles was that the family characteristics that are the measurement of the lands and grooves on the twenty-two .38 caliber dug-up bullets definitively did not

67

match Exhibit 44, the crime scene projectile. No mention was made by expert Story that any of these twenty-two dug-up bullets had a right-hand twist that would contrast with the left-hand twist on the Exhibit 44 murder scene projectile so as to eliminate them from being fired by a Colt pistol (as Briley testified). Instead, Story's conclusion that the crime scene projectile Exhibit 44 and the twenty-two .38 caliber bullets dug up from Indiana were not fired from the same gun was based on the family characteristics that did not match the lands and grooves on the bullets. That fact contrasts with the State's theory that the .38 Colt bobbed-hammer pistol purchased by Ingerson from Elrod was the murder weapon. In short, the State itself established that the .38 Colt bobbed-hammer pistol once owned by Ingerson was not the murder weapon.

Therefore, the State's evidence items (4) and (5) are not inferences drawn from facts but rather are speculation. A .44 Smith & Wesson pistol was found at the Ingerson residence. The pistol Wayman observed under the seat of the Ingerson vehicle on Saturday, June 28, 2008, was first reported and drawn as a pistol with a hammer and, by his testimony, said to have a Smith & Wesson stamp. Despite Wayman having picked out a Colt .38 at Cabela's nearly a year and a half after his original statement, Wayman's testimony at trial was that he chose the gun at Cabela's because it was the most like the gun he remembered seeing but that the gun he saw in Ingerson's vehicle was a Smith & Wesson. Story, the State's expert ballistics witness, definitively ruled out any Smith & Wesson as the murder weapon.

Ranger Briley interviewed Scott Wayman, an employee at the Kwik Kar car wash in August 2008. While vacuuming Ingerson's car on Saturday, June 28, Wayman noticed a pistol under the front seat driver side of the car. He wrote out a written statement in handwriting, which was then typed and sworn to by Wayman in front of a notary. He made a drawing of the gun that he saw admitted into evidence as State's Exhibit 172. The drawing clearly depicted a gun with a hammer. At the same time in August 2008, he initialed a picture of a gun that is State's Exhibit 170. Both the drawing and the picture identified a gun that had a hammer, thus not a bobbed-hammer gun. Both the prosecutor and defense counsel asked questions about the written statement prepared by Wayman; however, it was not introduced into evidence. Of course, it did not comply with the State's trial theory that the pistol under the seat on June 28, 2008, was a .38 Colt bobbed-hammer pistol. Wayman testified that the pistol he saw was a Smith & Wesson and that it had an S & W stamped on the grip. Ranger Briley put down in Wayman's sworn statement that Wayman saw the S & W on the grip and that Wayman thought it was a Smith & Wesson pistol. Several months later, in 2009, Ranger Briley and Detective Grizzard met Scott Wayman at a Whataburger where he was working in Keller, and they again addressed the subject of the pistol he had seen under the seat of Ingerson's vehicle. The focus of the investigation in 2009 was on the .38 Colt bobbed-hammer pistol. During their meeting, Briley and Grizzard showed Wayman pictures of a .38 Colt bobbed-hammer pistol and then took him to Cabela's to see if he could see a

pistol like the one he had described a year earlier. At Cabela's, Wayman chose a .38 Colt bobbed-hammer pistol as looking like the pistol he saw under the seat.

Wayman's testimony is the sole source of evidence about a pistol under the seat of Ingerson's vehicle. This testimony and this evidence fall short of proof beyond a reasonable doubt that the murder weapon was under the seat of Ingerson's car on June 28, 2008.

Item (6) in the State's summary directs attention to "the presence of gunshot residue under the driver's seat of [Ingerson's] car." Scott Wayman testified that a pistol with a Smith & Wesson trademark was under the driver's seat of Ingerson's vehicle at the car wash on the day after the murders. That weapon was logically the source of the powder residue found in that location, under the driver's seat. The fact that a weapon was under the driver's seat of Ingerson's vehicle likewise logically explains the minimal amount of gunshot particles found on the Ingerson's pants. The gunshot residue was not directly linked in any way to the murders. Furthermore, despite splash DNA evidence found near the two bodies, no DNA evidence was found on Ingerson's pants.

Item (7) and item (8) in the State's summary of argument relate to assertions on the part of the State that Ingerson was guilty of committing suspicious activity following the murders and gave incriminating statements to police and others. The facts are that Ingerson voluntarily met three separate times with law enforcement officials without counsel. On each occasion, Ingerson maintained his innocence. State's witnesses Grizzard and Briley both

70

testified that Ingerson was confused as to the time that he actually left Mikado because he believed that the bar had closed at 11 p.m. instead of midnight. That confusion falls short of being incriminatingly suspicious activity. Ingerson did not, even after heavy pressures being applied in the voluntary interviews, agree with the State's position that he committed the murders. His repeated denials are characterized by the State as a failure on his part to cooperate with investigating officers. Once again, the State's summary of evidence and argument amount to speculation and are not grounded in facts.

## V. CONCLUSION

The sole and only fact proven by the State beyond a reasonable doubt is that Ingerson was the last person seen at Richter's vehicle, where the victims' bodies were found. As this court has stated:

> Circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). And while juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *See, e.g.*, *Megan Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). "'[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them,' while '[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 16).

*Stobaugh v. State*, 421 S.W.3d 787, 861 (Tex. App.—Fort Worth 2014, pet. ref'd).

Having thoroughly reviewed all of the evidence and having categorized the evidence in accordance with its presentation in the State's brief, we make it clear

71

that our sufficiency review encompassed the cumulative force of all of the circumstantial evidence and the reasonable inferences supportable from that evidence viewed in the light most favorable to the State. We hold that after reviewing all of the circumstantial evidence and any reasonable inferences from that evidence, the evidence is insufficient to convince any rational factfinder beyond a reasonable doubt that Fred Earl Ingerson, III did intentionally or knowingly cause the death of an individual, Robyn Richter, by shooting her with a firearm and did intentionally cause the death of an individual, Shauna Ferris, by shooting her with a firearm. We hold that the evidence is insufficient to establish the elements of murder beyond a reasonable doubt.

Having sustained Ingerson's point challenging the sufficiency of the evidence to support his conviction, we need not address his remaining points. We reverse the trial court's judgment and render a judgment of acquittal. *See* Tex. R. App. P. 43.2(c), 51.2(d); *Greene v. Massey*, 437 U.S. 19, 24–25, 98 S. Ct. 2151, 2154–55 (1978); *Burks v. United States*, 437 U.S. 1, 16–18, 98 S. Ct. 2141, 2150–51 (1978); *Winfrey*, 393 S.W.3d at 774; *Stobaugh*, 421 S.W.3d at 869.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL:  DAUPHINOT and MEIER, JJ.[19]

PUBLISH

DELIVERED:  October 27, 2016

---

[19]Justice McCoy was a member of the original panel but has retired in the interim.